**UNITED STATES of America, Plaintiff,**

v.

**Latonya GREENE, Defendant.**

**Cr. No. 95–81082.**

United States District Court,
E.D. Michigan,
Southern Division.

July 23, 1997.

---

David Diebold, Detroit, MI, for Plaintiff.

R. Steven Whalen, Robert A. Sedler, Detroit, MI, for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL

ROSEN, District Judge.

### INTRODUCTION

On May 17, 1996, Defendant LaTonya Greene was convicted by a 12–member jury of two counts of bank robbery. Defendant Greene, an African–American, has moved for a new trial contending that she was denied her right to a trial by a jury drawn from "a fair cross section of the community" in violation of 28 U.S.C. § 1861 and the Sixth Amendment. She further argues that the Jury Selection Plan in the Eastern District of Michigan, specifically Section VIII(B) of the 1992 Plan, has institutionalized a race-based exclusion of qualified white jurors from jury service in violation of the equal protection guarantees of the Fifth Amendment and 28 U.S.C. § 1862.

Section VIII(B) of the 1992 Plan provides as follows:

> The qualified jury wheel shall be composed of persons who represent a fair cross-section of the area of each place of holding court as set forth in Section III of this Plan. To this end, if the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentages of the population of each group in the area of each place holding court, according to the most recently published national census report.

[Eastern District of Michigan Jury Selection Plan (1992), § VIII(B).]

The Government has responded to, and opposes, Defendant's Motion for New Trial. Having reviewed and considered the parties' briefs and the entire record of this matter,

and having heard the oral arguments of counsel at the hearing held on June 16, 1997, the Court is now prepared to rule on Defendant's motion.[1] This Opinion and Order sets forth the Court's ruling.

### DISCUSSION

#### I. THE EASTERN DISTRICT OF MICHIGAN JURY SELECTION PLAN

To fully address the arguments raised by Defendant in her new trial motion and the Government's counter-arguments opposing the motion, a historical overview of the development of the methods utilized in the Eastern District of Michigan in an attempt to meet the "fair cross-section" requirement of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. is necessary.

#### A. JURY SELECTION IN THE EASTERN DISTRICT—GENERAL OVERVIEW

The process of establishing the jury "wheel" from which jurors are summoned for jury service in the Eastern District of Michigan actually is a process that takes almost two years. The Court begins with source lists: voters' registration lists from the various cities, townships and villages that make up the voting precincts within the District, and drivers' license lists from the Michigan Secretary of State's office. Names are randomly selected from the source lists for the District's "Master Jury Wheel". Jury Questionnaires are then sent to the persons whose names were drawn for the Master Wheel to determine whether those persons are qualified for jury service. When the questionnaires are returned, juror qualifications are assessed. The names of those persons whose questionnaire responses establish that they are qualified to serve on a jury are then placed on the "Qualified Jury Wheel". From this Qualified Wheel, names are randomly drawn, generally in groups of 350, and sent summonses to appear for jury duty on specified dates. Those persons who appear on a given date for jury duty comprise the venire

---

1. This matter was submitted to the Court on a stipulated evidentiary record and all historical information referenced by the Court in this Opinion is the subject of this stipulation.

pool for that date. From this daily venire pool, venire panels for juries needed for trials that date are drawn, and it is, in turn, from the various venire panels of the day that individuals are randomly selected to serve on petit juries.

## B. *HISTORICAL EVOLUTION OF THE EASTERN DISTRICT OF MICHI-GAN'S JURY SELECTION PLAN*

As noted above, the Jury Selection Plan at issue is the 1992 Plan, which replaced and superseded the 1982 Jury Plan. The impetus for the development of the 1982 Plan was a comparison of the racial composition of the jury wheel drawn in February 1982 (approximately 11% black) with the 1980 census data which reflected a black population in the nine-county area making up the Eastern District of 19.2%. R. Mossing, *Changes in the Eastern District of Michigan Detroit Administrative Unit's Jury System,* 63 Mich. B.J. 33 (1984) [referred to hereinafter as "Mossing"]. Before the 1982 Plan was adopted, the qualified jury wheel was established exclusively by drawing jurors from voters' registration lists. *Id.* However, voter lists in Michigan tend to be unreliable. They are frequently outdated and continue to reflect the names of persons who had moved away or died because, unlike some states, Michigan state law does not require periodic purging of voter lists. During the 1980's, there was a ten-year waiting period before a municipality could remove an inactive voter from a voter list (unless there was proof presented that the voter had died or moved away).[2] *Id.* at 34. (The current law prevents a clerk from ever removing someone from a list based solely on inactive voter status. M.C.L.A. § 168.509bb.)[3] Thus, it is not uncommon for the federal court jury clerk to draw from the voter lists the names of persons who have moved or died since the list was last purged.[4]

Moreover, voter lists in Michigan are not kept on a county-wide basis. Therefore, to compile a district-wide list for the Eastern District of Michigan, the jury clerk must obtain over 600 separate voter lists from the various cities, townships and villages that make up the voting precincts in this district. This collection process, therefore, must be started two years in advance of the creation of a master wheel, and that two-year delay, alone, results in the lists being further outdated by two years. [Stipulation of Facts, ¶ 4.]

The 1982 Plan contained two innovations in the jury selection process intended to cure the deficiencies in the prior "voter list" only system: First, the source list for jurors, which previously had been based only on voters registration lists, was supplemented with drivers' license lists. Drivers lists tend to be more reliable because licenses are renewed at least every four years; a license can be suspended for failure to notify the Secretary of State of a change of address and an up-to-date address on one's drivers license is often required in order to cash a check or use a credit card. Mossing, *supra* at 34.

The early figures studying supplementation showed that supplementation alone would have raised the percentage of qualified blacks in the jury wheel to 14.2%. *Id.* However, there would still be a gap of 5% between the percentage of blacks in the jury wheel and the percentage in the population of the district. *Id.*

Therefore, the Court decided to couple the voters' list supplementation with a procedure referred to as "transfusion". The transfusion method called for sending a greater proportion of jury questionnaires to certain geographic areas known to have a high proportion of black residents. *Id.* at 33.

---

2. *See* M.C.L.A. § 168.502a (repealed Dec. 1, 1990).

3. It is possible for the clerk of a municipality to remove the names of persons no longer qualified to vote, but only if it is done pursuant to a city-wide or township-wide program. M.C.L.A. § 168.509dd. Such programs, however, are merely permitted, not required by the law. *Id.*

4. Indeed, of the 6,200 jury questionnaires sent to persons whose names were randomly drawn from voter registration lists for the September 3, 1982 master jury wheel, 25.75% of the questionnaires were returned undeliverable. Mossing, *supra* at 34.

The Plan called for transfusion to take place after a qualified jury wheel was created. If a "cognizable group" was "substantially underrepresented in the qualified jury wheel," the Chief Judge was authorized to "order additional names to be drawn from areas with a high population density of the underrepresented group." The Plan directed that these people "shall be sent juror questionnaires and such names shall be added to the Master Wheel." (Amended Plan, 1983, § 6.)

However, transfusion operated differently in practice, and in the three years that transfusion was implemented (1982, 1984 and 1986), it was done somewhat differently each time. [Affidavit of David R. Sherwood, ¶¶ 4–5.] For example, instead of introducing transfusion *after* a qualified wheel was created, the Administrative Order signed by then Chief Judge John Feikens on October 10, 1984 called for transfusion *at the time of the creation of the new master wheel.* Thus, more questionnaires were sent to "black geographical areas that [had] a low-yield rate in comparison to a high population." See A.O. No. 84x00113, attachment, p. 1. The Order targeted certain zip codes for additional jury questionnaires based on the high percentage of blacks that lived in those zip codes and the low response rate of that zip code to the mailing of questionnaires in the previous wheel. All of those zip codes were within the City of Detroit. *Id. See also,* A.O. No. 86x00185.

Because the Jury Selection and Service Act requires that the master wheel proportionately represent each county, 28 U.S.C. § 1863(b)(3), in sending extra questionnaires to predominately black zip codes in Detroit, the Court's Orders reduced the number that otherwise would have gone to other Wayne County zip codes.

By 1989, however, implementation of transfusion became problematic. [*See,* Sherwood Affidavit ¶¶ 5–8.] The complaints about the method, however, were not that it did not achieve the desired result. Transfusion, in fact, resulted in an increase in black

representation in the Qualified Wheel. [Stipulation of Facts, ¶ 15.] [5] Rather, the Clerk's office believed that the geographical census data, which was based on the 1980 Census, was already outdated. Certain neighborhoods had changed significantly and some had been virtually eliminated as a result of freeway and factory construction. [Sherwood Affidavit, ¶ 6.] In addition, Robert Mossing, who had developed and implemented the transfusion method almost singlehandedly, left the Court and the 1989 Clerk's office staff responsible for creating the Master Jury Wheel informed David Sherwood (Mossing's successor) that they did not understand the methods or steps used by Mr. Mossing to implement transfusion. [Sherwood Affidavit, ¶ 5.]

Furthermore, although relevant 1990 census data was expected in relatively soon, the Clerk's office was advised that it would not be ready in time for the next master wheel. [Sherwood Affidavit, ¶ 7.] In fact, the Bureau of Census advised the Clerk's office that data showing racial make up of particular geographic areas would not be ready until late 1992 or 1993. *Id.* (County-wide data, however, was available by 1992 and it revealed that the overall racial make up of the nine-county area was 19.1% black.)

Because of the lack of knowledge and experience with transfusion among the Clerk's office staff at the time, and because of the questionable reliability of the 1980 zip code census data, it was decided that some other method would have to be employed to ensure satisfaction of the statutory "fair cross-section of the community" requirement. [Sherwood Affidavit, ¶ 8].

In response to this need, David Sherwood, Clerk of the Court, devised the "subtraction" method which was subsequently embodied in Section VIII(B) of the 1992 Jury Selection Plan. *Id.*

Subtraction takes place after a qualified wheel has been created. To get to that point, the jury clerk randomly selects names from voter and driver lists to make up the

---

**5.** Defendant reports that Court Operations Manager, Kevin Williams, stated in his meeting with counsel for the parties that transfusion increased black representation in the jury pool to between 17% to 19%. [Defendant's Second Supplemental Brief, p. 3.]

master wheel. The clerk then sends questionnaires to a manageable number of persons randomly selected from the master wheel, and uses those responses to identify unqualified or exempt persons, thereby "qualifying" the wheel. Once this qualified wheel is created, its racial makeup is determined. If a cognizable group is substantially overrepresented, the Chief Judge will direct the jury clerk to randomly remove a certain number of names of persons belonging to that group until the wheel is "balanced". As a matter of practice, the wheel has routinely fallen short of the percentage of blacks in the voting age population of the district. Thus, it has been the names of non-black persons that have been "subtracted" from the wheel and these people lost their opportunity for jury service on that wheel. Until recently, once a white person's name was removed, that person was not returned to the wheel.[6]

It was Mr. Sherwood who proposed this plan to the Court's "Clerk's Office Committee" in 1990. [Sherwood Affidavit, ¶¶ 8–9.] No other court in the country uses the subtraction method. *See* Nancy J. King, *Racial Jurymandering: Cancer or Cure? A Contemporary Review of Affirmative Action in Jury Selection,* 68 N.Y.U.L.Rev. 707 (1993). The subtraction method was presented to the Court in forthright, informative manner. Mr. Sherwood said that when the written proposal was forwarded to the Clerk's Office Committee, the members were urged to review the materials carefully before the Committee meeting. [Sherwood Affidavit, ¶ 9.] However, the minutes of the Committee meetings as well as by the minutes of the monthly Judges' meeting in May 1990 indicate that the proposal was approved and adopted without any discussion of the pros or cons of the subtraction method. When the plan was subsequently presented to the Circuit Court Committee for approval in 1992, Administrative Manager Judy Christie was present. She, too, stated in interviews with counsel in this case that there was virtually no discussion about the plan when it was

approved. [*See* Defendant's Second Supplemental Brief, p. 4]

Mr. Sherwood has indicated that at the time the subtraction method was adopted, there were, and still are, other strategies available to increase black representation, including using additional source lists, such as lists of non-driving holders of state identification cards and utility subscriber lists. [Sherwood Affidavit, ¶ 10.] Mr. Sherwood stated, however, that in his opinion, every strategy or method has its advantages and disadvantages, some of which cannot be known until after either a formal study or actual use. *Id.*

Furthermore, with respect to using additional source lists, adding the use of state identification card lists was twice considered and twice rejected by the Court. *Id.* With respect to using utility subscription lists, Mr. Sherwood explained that such additional source lists can create new problems because they tend to include a disproportionate number of white male and business establishment property-owners and landlords which would not aid in increasing black representation. *Id.* at ¶ 12. In addition, it is not presently possible to weed out duplication between such lists and the voter and drivers license lists already used by the Court. *Id.* As for strategies available to increase response rate to jury questionnaires—which is perceived as one of primary reason for initial underrepresentation of blacks in the wheel—such as sending second or even third questionnaires, Mr. Sherwood stated that the Court already sends out second qualification questionnaires to those citizens who did not respond to the first questionnaire, and that the jury staff has consistently reported satisfactory results with the second notices. *Id.*

The "subtraction" of jurors from the Qualified Wheel as called for in Section VII(B) of the 1992 Jury Selection Plan is implemented through Administrative Orders issued by the Chief Judge, which specify the number of jurors to be removed from the wheel. The Administrative Order at issue in this case is the April 15, 1996 Administrative Order issued by then Chief Judge Julien Abele Cook, which provided, in pertinent part, as follows:

---

**6.** In April 1997, however, Chief Judge Anna Diggs Taylor entered Administrative Order No. 97–AO–019 implementing Section VIII(B) of the Jury Selection Plan, and for the first time since its first implementation in 1992, ordered that "[t]he names of the 1,462 jurors removed are to be retained for future use."

IT APPEARING THAT the Black population, as reported in the 1990 census for the nine counties for which the place of holding court is Detroit, is 19.1%, and

IT APPEARING THAT, as of April 15, 1996, the percentage of qualified Black jurors in the Detroit wheel created in 1995 is 16.09%

NOW, THEREFORE, IT IS ORDERED THAT, based on the information on the attached "Worksheet for the Removal of Jurors from the Qualified Detroit Wheel," the Clerk of the Court shall remove by a random process the names of 645 White and Other Qualified Jurors from the 3,749 total qualified juror[s] in the 1996 wheel to bring it into compliance with the cognizable group requirements of Section VIII.B of the Jury Selection Plan, approved on April 1, 1992, and the policy of the Court. As a result of this procedure the 1996 qualified Detroit wheel shall be composed of 593 Black qualified jurors and 2,511 White and Other qualified jurors.

96–AO–034.[7]

## II. DEFENDANT'S VENIRE PANEL AND HER SIXTH AMENDMENT/"FAIR CROSS-SECTION OF THE COMMUNITY" ARGUMENTS

As indicated above, according to 1990 Census data for the nine counties from which Detroit jurors are selected, the African–American population is 19.1%. Defendant first challenges the racial composition of the venire panel from which the jury at her trial was drawn contending that she is entitled to a new trial because the venire panel from which her jury was drawn on May 14, 1996 reflected a substantial under-representation of African–Americans as compared to the 19.1% African–American population in the community. Defendant voiced her objection to the 41–person venire panel at the time of jury voir dire in her trial. That panel consisted of 37 white members, one Hispanic and three African–Americans. Thus, African–Americans constituted only 7.3% of the venire panel.[8]

In addition to challenging the under-representation of African–Americans in the specific venire panel which appeared before this Court for jury selection on May 14, 1996, Defendant also argues that African–Americans were under-represented in the pool of 350 qualified jurors who were sent jury summonses on May 6, 1996. (It was from this 350–member pool that the prospective jurors who made up Defendant's venire panel were summoned to appear on May 14, 1996.) Of those 350 qualified jurors who were issued summonses on May 6, 1996, 53—or 15.4%—were African–American.

---

7. It should be noted that the jury qualification questionnaires sent to all prospective jurors, including those prospective jurors in the qualified wheel as of April 15, 1996 which was the subject of Judge Cook's Administrative Order, specifically advised that the racial and ethnic information requested would not be used to determine qualification for jury service. The questionnaire on its face states in Question 10, which asks the prospective juror to indicate his or her race:

   **10.  RACE**
   To assist in ensuring that all people are represented on juries, please indicate which of the following applies to you. Nothing disclosed will affect your selection for jury duty (see note 10 on reverse):

   ___ Black          ___ American Indian
   ___ White          ___ Asian
   ___ Other (specify)_____

   [Federal Court Juror Qualification Questionnaire, Question 10.]
   The note regarding question 10 on the reverse side of the form states:
   **Question 10—RACE.** Federal law requires you as a prospective juror to indicate your race. This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service. By answering this question you help the federal court check and observe the juror selection process so that discrimination cannot occur. In this way the federal court can fulfill the policy of the United States which is to provide jurors who are randomly selected from a fair cross section of the community.
   [*Id.,* Notes Regarding the Qualification Form, Note regarding Question 10.]

8. Defendant's jury was the second jury selected on May 14, 1996. The total jury venire for that date consisted of 49 persons. Before the venire panel was brought before this Court for jury selection in Defendant's case, Judge Hackett selected an eight-member jury consisting of two African–Americans and six whites, leaving 41 unselected venires from which to select a jury for Defendant's trial. Thus, of the total 49–person venire on May 14, 1996, African–Americans comprised 10.2%

Using the racial composition of the 350–member pool of summoned jurors, Defendant challenges the effectiveness of the Eastern District of Michigan's Jury Selection Plan and the Chief Judge's Administrative Orders entered to implement the Plan. Although Defendant admits that the Plan and implementing Orders were intended to insure that the representation of African–Americans in the Qualified Jury Wheel match the 19.1% African–American census figure, she argues that the adjustments in percentages in the Qualified Wheel made through the removal of whites to reach the 19.1% figure, do not alleviate the under-representation of African–Americans in jury venires.

Utilizing a statistical decision theory analysis, Defendant maintains that it is unlikely that, if the percentage of African–Americans in the Qualified Wheel were 19.1%, a randomly selected group of 350 jurors would have a percentage of 15.4% or less African–Americans. Defendant explains her position by using the formula for the standard error of mean as presented in Knoke and Bohrnstedt, *Basic Social Statistics,* § 7.2 (1991).

Under established statistical theory, every possible group of 350 jurors randomly drawn from the Qualified Wheel would fall into a bell curve. If the qualified pool is 19.1% black, then the high point, or middle of the curve, would be at 19.1%. At the very extreme ends of the curve would be juries which were 100% white or 100% black. The chance of this occurring randomly would be minute.

By computing the standard error of the mean, it can be shown how often it might be expected to randomly draw a jury with a particular proportion of a particular group. Using a percentage of 19.1% black in the qualified pool and a randomly selected group of 350 from whom the trial jurors will be drawn, the formula for standard error is as follows:

Std. Error = SQRT [ (p × q)/N]

| Where | p = proportion of blacks in pool | (= .191) |
| | q = proportion of non-black | (=.809) |
| | N = sample size being drawn | (350) |

The standard error SQRT [ (.191 × .809)/350], thus, is .02101155.

Using this figure, it can be determined how different the mean in a sample of 350 (.154) is from the population mean (.191) in standardized terms. This is called a "z score".

z = (sample mean—population mean)/standard error

z = [ (.154—.191)/.0210115] = –1.76

A standard table is used to look up a z score of –1.76, which shows that a jury with 15.4% African–Americans or less would be expected to be drawn in only 3.92% of cases. Conversely, a percentage of African–Americans higher than 15.4% would be expected in 96.8% of the juries drawn.

Defendant's position is that the 3.92% figure is statistically significant because, drawing a group with 15.4% African–Americans or less is so unlikely to happen by random chance that it may be presumed that something non-random affected the results. Thus, based upon this statistical analysis, Defendant contends that she has made a *prima facie* showing of systematic exclusion of African–Americans in the jury-selection process.

In response to Defendant's "fair cross section" arguments, the Government first argues that, procedurally, Defendant's motion for new trial was untimely made under 28 U.S.C. § 1867(a), and therefore, should not be considered at all by this Court. With respect to the substance of Defendant's arguments, the Government contends that Defendant has failed to identify any exclusionary mechanisms in the Eastern District of Michigan's jury selection process which operate to exclude blacks from jury service.

**A. DEFENDANT'S MOTION FOR NEW TRIAL WAS NOT UNTIMELY UNDER 28 U.S.C. § 1867**

The Government maintains that Defendant's motion for new trial is untimely under 28 U.S.C. § 1867(a), because she did not raise an objection to the jury selection procedures prior to *voir dire.*

Section 1867 governs challenges with jury selection procedures. Subsection (a) of that statute provides:

(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

While the Government is correct in its assertion that § 1867(a) does, in general, limit the time for challenging compliance with the procedures for jury selection set forth in the Jury Selection and Service Act, 28 U.S.C. §§ 1861–1878, the time constraints of subsection (a) are not applicable to constitutional claims. Section 1867(e) explicitly provides:

(e) The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States, or a party in a civil case may challenge any jury on the ground that such a jury was not selected in conformity with the provisions of this title. *Nothing in this section shall preclude any person or the United States from pursuing any other remedy, civil, or criminal, which may be available for the vindication or enforcement of any law prohibiting discrimination on account of race, color, religion, sex, national origin or economic status in the selection of persons for service on grand or petit juries.*

28 U.S.C. § 1867(e) (emphasis added).

According to the House Report on the Jury Selection and Service Act, the Act was specifically not intended to "preclude any person or the United States from asserting rights created by other statutes **or for enforcing constitutional rights.**" H.Rep. 1076, 90th Cong., 2d Sess. p. 16, U.S.Code Cong. & Admin. News, 1968, pp. 1792, 1806 (emphasis added). *See also, United States v. De Alba–Conrado*, 481 F.2d 1266, 1269–70 (5th Cir.1973) (holding that one who fails to

assert a challenge to jury selection procedures before or during *voir dire* is foreclosed from later tardy actions which attack the validity of the jury plan, but remanding the issue of whether the defendant had actually asserted a constitutional claim which would not be barred by the same statutory constraints); *United States v. Grose*, 525 F.2d 1115, 1118–19 (7th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976) (although a statutory challenge to the jury array was precluded because of defendant's failure to make such a challenge before voir dire, his constitutional challenge was not foreclosed).

The foregoing authorities make clear that Defendant's Sixth Amendment challenge is not barred by the time constraints of 28 U.S.C. § 1867.[9]

## B. DEFENDANT HAS FAILED TO ESTABLISH A VIOLATION OF HER SIXTH AMENDMENT RIGHT TO TRIAL BY A JURY DRAWN FROM A FAIR CROSS SECTION OF THE COMMUNITY.

The Sixth Amendment guarantees "the right to a speedy and public trial, by an *impartial jury* of the State and district wherein the crime shall have been committed." U.S. CONST., amend. VI. The United States Supreme Court has interpreted the Sixth Amendment's right to a trial by an *impartial jury* as encompassing the right to a jury drawn from a "fair cross section of the community." *See, Taylor v. Louisiana*, 419 U.S. 522, 526–31, 95 S.Ct. 692, 696–98, 42 L.Ed.2d 690 (1975), and cases cited therein. However, the Court emphasized that, although petit juries "must be drawn from a source fairly representative of the community", there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538, 95 S.Ct. at 702. "Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically ex-

---

**9.** Ms. Greene concedes that her *statutory* challenge to jury selection is untimely. [See Defendant's Final Reply Brief, p. 2.]

clude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (citations omitted.) *See also, Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (re-affirming that a defendant has no Sixth Amendment right to a petit jury representing a fair cross-section of the community).

In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court set forth the criteria necessary to establish a *prima facie* violation of the fair cross-section requirement. A defendant challenging the composition of the jury pool must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; *and*
> (3) that under-representation is due to a systematic exclusion of the group in the jury selection process.

*Id.* 439 U.S. at 364, 99 S.Ct. at 668. If a *prima facie* fair-cross-section infringement is established, the government may justify that infringement by showing a significant state interest that manifestly and primarily advances "those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367–68, 99 S.Ct. at 670.

Defendant in this case has not satisfied the *Duren* criteria.

As to the first element, Defendant alleges that African–Americans are under-represented in the Eastern District of Michigan venires. The Supreme Court recognizes that African–Americans are a "distinctive" group in the community. *See Alexander v. Louisiana,* 405 U.S. 625, 633–34, 92 S.Ct. 1221, 1227, 31 L.Ed.2d 536 (1972). Therefore, there is no dispute that Defendant meets the first *Duren* fair-cross-section challenge requirement.

With respect to the second *Duren* requirement, that the representation of the "distinctive" group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, Defendant argues that whether the relevant venire pool be deemed to be the 41 venires selected for her case, the 49 venires who appeared for jury duty on May 14, 1996, or the 350 persons to whom jury summonses were sent on May 6, 1996 and from which the jury venires for May 14 were drawn,[10] there is a significant disparity between the percentage of African–Americans in the community and the percentage presented in the venire pools. As set forth above, African–Americans comprised 7.3% of the venires who appeared for jury selection for her trial, while the percentage of African–Americans of all venires who appeared on May 14, 1996 was 10.2%. These venires were selected from a pool of 350 persons who were sent summonses for jury duty on May 6, 1996. 15.4% of those 350 persons who were issued summonses on May 6, 1996 were black. Thus, the "absolute disparity" between the percentage of African–Americans in the community and the percentage present in the group of 41 venires who appeared in Defendant's case is 11.8%[11] The disparity between the percentage of the community population and the percentage present in the total venire pool on May 14, 1996 is 9.9% and the disparity between percentage of the com-

---

**10.** No facts have been presented from which it may be ascertained if, in fact, all 350 persons summoned appeared for jury duty. Therefore, there is no basis from which to ascertain whether Defendant's analysis based on a purported 350-member *venire pool* is statistically sound.

**11.** Absolute disparity in the jury selection context is defined as the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire. *Ramseur v. Beyer, supra,* 983 F.2d at 1231, citing National Jury

Project, *Jurywork: Systematic Techniques,* § 5.05[2][c][I], [ii], and [iv]. Although normally, only that segment of the population eligible for jury duty is used in determining absolute disparity, because the Eastern District uses a system guaranteeing that the percentage of qualified black jurors on the jury wheel be the same as the percentage of blacks in the population, the Court will treat Defendant's use of disparities in venire panels and pools as "absolute disparity" arguments.

munity population and the percentage of blacks in the group of 350 persons who were issued jury summonses on May 6, 1996 is 3.7%.

■ The imbalance necessary to establish a Sixth Amendment violation is not determined by a bright line test. More than mere numbers must be provided in order to establish that African–Americans are systematically under-represented in the venire. *See Alexander v. Louisiana, supra,* 405 U.S. at 629–31, 92 S.Ct. at 1225. The Supreme Court has recognized, however, that it may be possible to infer that unconstitutional exclusion exists when there is a sufficiently large disparity between a group's population figures and its representation in the jury venire such that it is unlikely that the disparity results from random chance. *See Castaneda v. Partida,* 430 U.S. 482, 496–97 & n. 17, 97 S.Ct. 1272, 1281 & n. 17, 51 L.Ed.2d 498 (1977). However, courts addressing the question of whether a given disparity constitutes sufficiently substantial under-representation to trigger operation of this inference have held that absolute disparities between 2.0% and 21.7% do **not** constitute substantial under-representation. *See e.g., Ford v. Seabold,* 841 F.2d 677 (6th Cir.1988), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988), in which the Sixth Circuit stated that a disparity as large as 21.7% is "far below that found unreasonable in *Duren.*" *Id.* at 684. As the Supreme Court noted in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), discrepancies of less than 10%, standing alone, cannot support a claim of under-representation. In *United States v. McAnderson,* 914 F.2d 934, 941 (7th Cir.1990), the defendant challenged the venire as under-representative of the black population where only 12% of the venire was black, but the population of that group in the Northern District of Illinois was 20%. The Court rejected the defendant's under-representation claim, explaining, "We have never held that such a *de minimis* disparity amounts to an unfair or unreasonable representation of any 'distinct group'".

**12.** By contrast, in *Duren,* the Supreme Court found significant an under-representation established by evidence of a **39% disparity** that was

*Id. See also, Ramseur v. Beyer,* 983 F.2d 1215, 1232 & n. 18 (3rd Cir.1992), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993), and cases cited therein.

■ A Sixth Amendment analysis of whether a group's representation is "fair and reasonable in relation to the number of persons in the community" requires a determination of whether a group's representation in the jury pool is "unfair" such that the proper functioning of the jury system is threatened. *Ramseur v. Beyer, supra,* 983 F.2d at 1234. The strength of the evidence of under-representation is only one factor to be considered; factors such as the nature of the process by which jury lists are composed and the length of time of under-representation, together with the strength of the evidence that purports to establish an "unfair and unreasonable" representation should be examined. *Id.* at 1235. *See also, Ford v. Seabold, supra* (examining length of time of under-representation and nature of process by which jury lists are composed); *United States v. LaChance,* 788 F.2d 856, 866–69 (2d Cir.1986) (examining length of time of under-representation and strength of evidence that purports to establish an unfair and unreasonable representation).

Thus, in *Ford v. Seabold, supra,* the Sixth Circuit found that an absolute disparity of 18.7% and 21.7% based of two venire samples insufficient. 841 F.2d at 685. Similarly, in *Ramseur v. Beyer,* the court found the defendant's evidence of a 14.1% absolute disparity based on studies covering a ***two-year*** period inadequate. 983 F.2d at 1233.[12]

■ In this case, Defendant relies upon statistics pertaining to only a single day's venire—the venire on May 14, 1996—and the pool of 350 persons who were issued jury summonses on May 4th. As the authorities cited above demonstrate, statistics concerning only one actual jury venire and one pool of summoned jurors is patently insufficient evidence to establish systematic under-representation.

evident in **every weekly venire for a period of over one year.**

Moreover, Defendant's percentages fail to take into account the randomness of the selection process or those people who fail to show up for jury duty.[13]

Even assuming arguendo that Defendant had established a statistically significant disparity sufficient to establish an unfair and unreasonable under-representation of African–Americans in venires from which juries are selected, Defendant has not met the requirements of the third prong of the *Duren* test by presenting proof that under-representation is due to a "systematic exclusion" in this Court's jury selection procedure. As the Tenth Circuit observed in *United States v. Edwards*, 69 F.3d 419 (10th Cir.1995), in which the defendant challenged a jury venire that had only one African–American when the composition of community reflected 9.8% Blacks, it was merely "[b]y chance [that] the venire had only one non-caucasian. In the absence of a showing of a 'systematic exclusion' of African–Americans, Defendant Edwards has failed to demonstrate a prima facie violation of the fair-cross-section requirement." *Id.* at 437. *See also, United States v. McAnderson, supra,* 914 F.2d at 941; *See also, United States v. Hardwell,* 80 F.3d 1471, 1486 (10th Cir.1996) (defendant "simply argues that systematic exclusion can be inferred from the underrepresentation in a single venire. This argument is without merit." *Id.*)

As Defendant acknowledges, this Court has adopted a Jury Selection Plan for the Eastern District of Michigan which is specifically designed to *increase* representation of African–Americans in the jury process. In accordance with the Plan, the Eastern District uses driver's license lists to supplement voter registration lists to ensure a better representation of minorities in the Court's qualified jury wheel. The circuit courts have consistently found that drivers' license lists and voter's registration lists are "facially neutral" and allow no opportunity for subjective or racially motivated exclusions. *Ramseur, supra. See also, Ford v. Seabold, supra,*

841 F.2d at 685 (holding that the selection of jurors from a neutral master list, without more, cannot be construed as "systematic exclusion" as defined in *Duren* merely because the percentage of the venirepersons selected does not precisely mirror the percentage of the group in the entire community).

Indeed, the Eastern District's Plan goes much further than merely supplementing voters' registration lists with drivers' license lists. It further provides in pertinent part:

> [I]f the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentages of the population of each group in the area of each place holding court, according to the most recently published national census report.

[Eastern District of Michigan Jury Selection Plan (1992), § VIII(B).]

In accordance with the Jury Selection Plan, on April 15, 1996, then Chief Judge Julian Abele Cook, Jr. issued an Administrative Order directing:

> [T]he Clerk of the Court [is] to remove by a random process the names of 645 White and Other Qualified Jurors from the 3,749 total qualified juror[s] in the 1996 wheel to bring it into compliance with the cognizable group requirements of Section VIII.B of the Jury Selection Plan.... As a result of this procedure the 1996 qualified Detroit wheel shall be composed of 593 Black qualified jurors and 2,511 White and Other qualified jurors.

A.O. 96–AO–034.

This procedure was implemented by the clerk, and was in place at the time of the jury venire and jury selection in Defendant's case.

■ Defendant's only "evidence" of systematic exclusion of African–Americans is

---

**13.** Indeed, in Defendant's case, court records indicate that 10 Blacks were summoned to appear for jury service on May 14, 1996, the date on which jury selection was held in Defendant's case, but four failed to appear. Five African-

Americans did appear. Two of the black venire persons who did appear for jury service were selected to serve on a jury in Judge Hackett's court before jury selection commenced in Defendant's case.

her probability statistics derived from the percentage of blacks in one 350–person pool of summoned prospective jurors. Based upon Defendant's probability formula, Defendant surmises that if prospective jurors are truly randomly being drawn from a qualified wheel in which African–Americans comprise 19.1%, then there would be less than a 4% chance that a draw of 350 persons would have only a 15.4% representation of blacks (i.e., a 3.7% under-representation), as was the case with the jury summonses issued on May 6, 1996. Without any citation of legal authority, Defendant contends that because the probability of a 3.7% under-representation of blacks is slight, it can be assumed that the May 6, 1996 draw of jurors was not random. The Court disagrees. Probabilities and assumptions without more—particularly in light of the only slight 3.7% under-representation of blacks in the 350–person pool—cannot establish a *prima facie* case of "systematic exclusion". Indeed, the Sixth Circuit expressly rejected the use of the statistical theory utilized by Defendant in this case to support a *Duren* claim in *Ford v. Seabold, supra,* noting "our rejection of the use of SDT [statistical decision theory] in the context of a fair-cross-section claim is supported by the majority of courts which have considered the issue." 841 F.2d at 684, n. 5.

The foregoing makes clear that there is simply no support for Defendant's claim that any under-representation of African–Americans in the venires from which her jury was selected was due to a "systematic exclusion" of that group in the jury selection process. As this Court pointed out in denying Defendant's oral motion during trial concerning the jury venire matter,

> We [in the Eastern District of Michigan] have made more of an effort than any other Federal district court in this entire nation to insure minority representation. . . . Short of going out on the street

and harvesting people based on racial characteristics, I don't know what more we can do.

Indeed, the efforts of the Eastern District to achieve fair representation of minorities has been recognized by scholars and commentators to be the most aggressive and far-reaching of any district court in the country.[14] In fact, this Court has gone to such lengths in its efforts to increase minority representation in venire panels and its jury wheel in general that Defendant has mounted a serious challenge to the court's jury selection system based upon the deprivation of white persons' right to jury service under the Equal Protection Clause of the Constitution, the issue to which the Court will turn next. Far from systematically excluding blacks from jury service, the Court has attempted, since 1982, to systematically *include* and *increase* black representation and participation in its juries. That the Court's efforts have not achieved a statistical ideal in every venire panel or petit jury does not mean that its jury selection system is constitutionally flawed.

■ Based upon the foregoing discussion, the Court finds no merit in Defendant's Sixth Amendment challenge to the jury selection process, and accordingly, the Court finds no denial of Defendant's Sixth Amendment right to a trial by a jury drawn from a fair cross section of the community.

### III. *DEFENDANT'S EQUAL PROTECTION CHALLENGE*

Defendant next challenges the jury selection process in this Court on Equal Protection grounds, contending that the Eastern District of Michigan Jury Selection Plan institutionalizes the race-based exclusion of otherwise qualified *white* jurors in violation of the equal protection guarantees of the Fifth Amendment.[15] Specifically, Defendant

14. *See* Nancy J. King, *Racial Jurymandering: Cancer or Cure? A Contemporary Review of Affirmative Action in Jury Selection,* 68 N.Y.U. L.Rev. 707, 722–723 (1993); Randall Kennedy, RACE, CRIME AND THE LAW (Pantheon Books 1996), pp. 238–239.

15. Although Defendant refers to her equal protection challenge in terms of a violation of the

Fourteenth Amendment, because this case does not present action by a State, but rather by the Federal government, the constitutional challenge alleged is actually a Fifth Amendment violation. The same constitutional principles apply whether the equal protection challenge is brought under Fourteenth or the Fifth Amendment. *See, Ada-*

challenges Section VIII(B) of the Plan, which provides:

> The qualified jury wheel shall be composed of persons who represent a fair cross-section of the area of each place of holding court as set forth in Section III of this Plan. To this end, if the Court determines that a cognizable group of persons is substantially overrepresented in the qualified jury wheel, the Chief Judge shall order the Clerk to remove randomly a specific number of names so that the population of each cognizable group in the qualified wheel closely approximates the percentages of the population of each group in the area of each place holding court, according to the most recently published national census report.

[Eastern District of Michigan Jury Selection Plan (1992), § VIII(B).]

Defendant Greene argues that the Plan's race-based subtraction method—which was in place and utilized by the Court when the jury was selected for her trial—is unconstitutional because it violates the equal protection rights of white jurors removed from the jury wheel by denying them their right to jury service.

The Government raises four arguments against Defendant's equal protection challenge. First, the Government argues that Defendant Greene lacks standing to assert the rights of potential jurors affected by the Jury Plan.[16] Second, the Government argues that, even if the Court determines that Defendant has standing to assert the equal protection rights of removed potential white jurors, the Court should not consider Defendant Greene's equal protection challenge in this case because she did not raise this challenge prior to trial as required under Fed. R.Crim.Pro. 12(b). Third, the Government contends that Defendant improperly raised this argument for the first time in a supplemental brief which was not filed until after the time limit for filing new trial motions set forth in Fed.R.Crim.Pro. 33 had expired.[17] Lastly, the Government argues that, even if the Court does elect to consider the equal protection argument, the subtraction method is a narrowly tailored measure that is reasonably necessary to advance the compelling state interest of more representative jury pools.

## A. STANDING

■ It is well-established that, in general, a litigant must assert his or her own legal rights and interest, and cannot rest a claim to relief on the legal rights or interests of third parties. *Department of Labor v. Triplett*, 494 U.S. 715, 720, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701 (1990); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Defendant acknowledges that her own equal protection rights are not implicated here. As a general proposition, in order to show a violation of her own equal protection rights, "the defendant must show that the procedure employed resulted in substantial underrepresentation of [her] race or of the identifiable group to which [she] belongs." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Rather, Defendant here argues that the Eastern District of Michigan's 1992 Jury Selection Plan violates the rights of potential white jurors, and she seeks to assert those rights. To do so, however, Defendant must be found to have "third-party standing."

---

rand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

**16.** Although, chronologically, standing was not the first argument raised by the Government, because a litigant's standing is a jurisdictional matter for Article III courts, it is a threshold question that must be resolved before the court may address any substantive issues. *Linda R.S. v. Richard D.*, 410 U.S. 614, 615, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *O'Shea v. Littleton*, 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Planned Parenthood Ass'n v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir.1987).

Therefore, the Court will treat the standing issue as the first issue to be addressed and resolved in this case.

**17.** As noted above, Defendant has conceded that any *statutory* challenge to the jury selection process would not be timely, and as discussed *supra*, the statutory time constraints do not apply to constitutional challenges. However, with respect to Defendant's equal protection argument, the Government's untimeliness argument is not solely based on 28 U.S.C. § 1867(a); it is also based upon Fed.R.Crim.Pro. 12(b) and 33.

■ The Supreme Court has permitted a limited exception to the rule that allows only the assertion of one's own rights, and has allowed litigants to assert the rights of third parties, provided that three important criteria are satisfied. First, the litigant must have suffered an "injury in fact", thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute. *Singleton,* 428 U.S. at 112–13, 96 S.Ct. at 2873. Second, the litigant must have a close relation to the third party. *Id.* at 113–14, 96 S.Ct. at 2873–74. And third, there must exist some hindrance to the third party's ability to protect his or her own interests. *Id.* at 114–16, 96 S.Ct. at 2874–75.

Applying these criteria, the Supreme Court has found third-party standing in the physician-patient context, *see e.g., Griswold v. Connecticut* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Planned Parenthood official and physician entitled to raise the constitutional rights of contraceptive users with whom they had a professional relationship); in the vendor-vendee context, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (licensed beer vendor entitled to assert the equal protection challenge of a customer to a statutory scheme limiting sale of beer based on age and gender); and in the attorney-client context, *Department of Labor v. Triplett, supra* (attorney may challenge an attorney's fee restriction by asserting the due process rights of his client).

The specific issue of whether a criminal defendant has third-party standing to raise the equal protection rights of jurors excluded from jury service was squarely addressed by the Supreme Court in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In that case, a white defendant raised an equal protection challenge to the prosecution's use of peremptory challenges to remove six black venirepersons from his jury based upon *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which a black criminal defendant successfully challenged the discriminatory use of peremptory challenges by a prosecutor to remove potential black jurors from his jury.

Applying the three *Singleton* criteria, the Court found that Defendant Powers was entitled to third-party standing and to assert the equal protection rights of the excluded black jurors. With respect to satisfaction of the first requirement—an injury-in-fact to the defendant—the *Powers* Court found:

> The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice.... [This] is because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of the criminal proceeding in doubt.

> The jury acts as a vital check against the wrongful exercise of power by the State and its prosecutors. The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice.... Active discrimination by a prosecutor during this process condones violations of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law.

> \*   \*   \*   \*   \*   \*

> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. Upon these considerations, we find that a criminal defendant suffers a real injury when the prosecutor excludes jurors at his or her own trial on account of race.

499 U.S. at 411–13, 111 S.Ct. at 1371–72 (citations omitted.)

The *Powers* Court also found the second prong—"close relationship with the third party"—satisfied, explaining:

> We noted in *Singleton* that in certain circumstances the relationship between the litigant and the third party may be such

that the former is fully, or very nearly, as effective a proponent of the right as the latter. Here the relation between petitioner and the excluded jurors is as close, if not closer than, those we have recognized to convey third-party standing in our prior cases.... Voir dire permits a party to establish a relation, if not a bond of trust, with the jurors. This relation continues throughout the entire trial and may in some cases extend to sentencing as well.

*Id.* at 413, 111 S.Ct. at 1372 (citations omitted).

In connection with the second requirement, the *Powers* Court also noted a "common[ality] of interest between a litigant and a juror excused on account of race":

Both the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination in the courtroom. A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character. The rejected juror may lose confidence in the court and its verdicts, as may the defendant if his or her objections cannot be heard. This congruence of interests makes it necessary and appropriate for the defendant to raise the rights of the juror.

*Id.*

Finally, with respect to the last prong of the inquiry concerning the likelihood and ability of the excluded venirepersons to assert their own rights, the Court stated:

We have held that individual jurors subjected to racial exclusion have the legal right to bring suit on their own behalf. As a practical matter, however, these challenges are rare. Indeed, it took nearly a century after the Fourteenth Amendment and the Civil Rights Act of 1875 came into being for the first such case to reach this Court.

The barriers to suit by an excluded juror are daunting. Potential jurors are not parties to the jury selection process and have no opportunity to be heard at the time of their exclusion. Nor can excluded jurors easily obtain declaratory or injunctive relief when discrimination occurs through an individual prosecutor's exercise of peremptory challenges. Unlike a challenge to systematic practices of the jury clerk and commissioners such as we considered in *Carter [v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) ] it would be difficult for an individual juror to show a likelihood of discrimination against him at the voir dire stage will recur. And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation. The reality is that a juror dismissed because of race probably will leave the courtroom possessing little incentive to set in motion the arduous process needed to vindicate his own rights.

*Id.* at 414–15, 111 S.Ct. at 1372–73 (citations omitted).

Applying the *Singleton/Powers* criteria, the Supreme Court also found third-party standing in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), another case involving race-based exercise of peremptories during voir dire. In *Edmonson,* the Court determined that the *Powers* standing rule was not limited to criminal defendants, and accordingly determined that a black civil litigant was entitled to assert the equal protection rights of an excluded black juror under the principles of third-party standing. 500 U.S. at 628–31, 111 S.Ct. at 2087–88. Similarly, in *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Court permitted the State of Georgia to assert third-party standing and challenge the white defendant's use of race-based peremptories by asserting the constitutional rights of the excluded black jurors. *See also, Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), in which the Court found that a white defendant had standing to challenge the jury selection system used to select both the grand jury that indicted him and the petit jury that tried him contending that the method which the state court used to select grand and petit juries arbitrarily excluded blacks from jury service.[18]

18. Although *Peters* did not involve third-party standing to assert an equal protection challenge,

■ Turning to Defendant Greene and her equal protection challenge in the instant action, the Court finds that Defendant Greene has satisfied the all of the elements of the tripartite test for third-party standing to raise an equal protection challenge. First, with respect to the "injury-in-fact" requirement, as the Court in *Powers* found, "because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of the criminal proceeding in doubt", there can be no question that "the intrusion of racial discrimination into the jury selection process damages both the fact and the perception of the Defendant's guarantee of a fair trial". The Government's assertion that there was no "underrepresentation of whites" on Defendant's jury is not relevant to the issue of injury to the Defendant caused by discrimination. Rather, in the context of the injury inquiry for standing purposes, the pertinent inquiry is whether the selection process "casts doubt upon the integrity of the judicial process and places the fairness of the criminal proceedings in doubt." *Powers, supra,* 499 U.S. at 411, 111 S.Ct. at 1371.

In *Peters, supra,* the State made essentially the same argument that the Government makes in this case, i.e., that the Defendant was not harmed by the exclusion of jurors of a different race and, therefore, should be denied standing to mount a constitutional challenge to the jury selection system used by the court to select grand and petit juries. 407 U.S. at 498–99, 92 S.Ct. at 2166. The Supreme Court squarely rejected that argument. The State argued that Defendant Peters, a white man, did not have standing to challenge a jury selection system which he claimed arbitrarily excluded blacks from jury service because he could not show that he was "harmed" by the exclusion of members of another race, even if the grand and petit juries were unconstitutionally selected. *Id.* The Court rejected the State's argument, explaining:

[E]ven if there is no showing of actual bias in the tribunal, this Court has held that due process is denied by circumstances that create the likelihood or the appearance of bias.... As this Court said in *In re Murchison,* [349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955)], "[f]airness of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." 349 U.S., at 136 [75 S.Ct. at 625].

These principles compel the conclusion that a State, cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. *Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process.*

\* \* \* \* \* \*

It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how that jury would have decided the case.... In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few.

*Accordingly. we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury on the ground it that arbitrarily excludes from service the members of any race, and thereby denies him due process of law.*

407 U.S. at 502–04, 92 S.Ct. at 2168–69 (emphasis added).

This Court, too, believes that active discrimination at any stage of the jury selection process against any identifiable group— whether the identifiable group is a racial

---

its ruling that a criminal defendant has standing to challenge a jury selection *system,* regardless of the fact that the challenge concerns a system that

excludes persons not of the same race as defendant is instructive. *Peters* is discussed more fully *infra.*

minority or a racial majority [19]—by the very institution entrusted with insuring jury service rights under the United States Constitution causes injury to any litigant.

The Court will turn next to the third prong of the test, that of the excluded jurors' ability to protect their own interests. It is patently clear to this Court that, as a practical matter, potential white jurors excluded at the Jury Wheel stage have very little, if any, real opportunity or ability to assert their own rights. Indeed, persons excluded at the Jury Wheel stage have less incentive than jurors excluded at the voir dire stage. This is so because when exclusion occurs at the Jury Wheel stage, the excluded potential jurors do not know that their rights may have been violated since they do not even know that they have been excluded. Thus, the Court finds the third prong of the *Singleton/Powers* test is satisfied.

The more problematic prong for Defendant here is the second prong of the test—whether there is a close relationship between the litigant and the excluded jurors—and this is where the Government focuses its standing argument. Relying on the *Powers* Court's discussion of "the special bond of trust" that is established **during voir dire**, the Government argues that here there is no "relation" or "bond of trust" established between the Defendant and any juror excluded at the time the master jury wheel is being established.

This clearly creates the closest question and one which requires the most searching inquiry. The Court begins its analysis by noting that the *Powers* Court, itself, in finding standing for a white person to raise the Equal Protection injury rights of excluded black persons, emphasized the common interest of a litigant and excluded jurors in eliminating discrimination from the courtroom.[20]

▮ Just as importantly, a finding of lack of third-party standing in this case would effectively mean that no one could ever challenge a discriminatory jury selection practice at the establishment of the qualified wheel stage. All citizens have the equal protection right not to be excluded from jury service on the basis of irrelevant factors such as race. *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). When a particular group is singled out by a systematic exclusion from all jury service, its members have been treated differently and have suffered the deprivation of a right and responsibility of citizenship. *Powers, supra,* 499 U.S. at 423–25, 111 S.Ct. at 1378 (Scalia, J. dissenting). To deny third-party standing to criminal defendants challenging the exclusion of any group singled out for exclusion from jury service, regardless of the point at which the exclusion takes place, would mean that effectively no one could challenge a discriminatory practice, because it takes place *sub silentio.* Clearly, the Constitution cannot preclude a challenge to illegal discrimination merely because it takes place outside of the public scrutiny.

In this context, it strikes the Court that what is really at issue under the second prong of the *Singleton* test is not only the relationship between the excluded juror and the Defendant once the juror is in the courtroom, as the Court recognized in *Powers,* but also the relationship between the Defendant and the excluded person in their respective roles as an accused, on the one hand, and a prospective arbiter of justice on the other.

---

19. The guarantees of equal protection apply to all persons, regardless of race. *University of California v. Bakke,* 438 U.S. 265, 287–89, 98 S.Ct. 2733, 2747, 57 L.Ed.2d 750 (1978) Hence, discrimination against whites, no less than blacks, violates equal protection. *Id.* at 295, 98 S.Ct. at 2750–51 ("It is far too late to argue that the guarantee of equal protection to all persons permits the recognition of special wards entitled to a degree of protection greater than accorded others."). *See also, Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102

L.Ed.2d 854 (1989); *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995).

20. Indeed, even the dissent in *Powers,* which vigorously disagreed with the majority's finding of third-party standing and its determination of "special relationship" between the excluded juror and the criminal defendant in a challenge of a prosecutor's discriminatory use of a peremptory strike at the voir dire stage, suggested that third-party standing might be satisfied in cases involving the "categorical exclusion of a group from jury service". 499 U.S. at 424, 111 S.Ct. at 1378 (Scalia, J. dissenting).

Although that relationship may become most concretely evident once the courtroom drama opens, it is a relationship which begins when the defendant is first accused by charge or indictment and the prospective juror is first qualified for the Jury Wheel. The relationship is as primary actors in a single system.

To draw a distinction at the courtroom door, or at the jury box, ignores the realties of the litigation process and the roles of the defendant and the jury. Just as, for standing purposes, a defendant has a relationship with the court as an institution, so, too, does that relationship extend to those who would be selected as the ultimate judge of the defendant's guilt or innocence. It is the role that the prospective juror plays in the justice system that defines the relationship, not merely the fact that the prospective juror was in the courtroom with the Defendant and participating in voir dire.[21]

As the Supreme Court determined in *Peters v. Kiff, supra,* a criminal defendant who has been subjected to indictment by a grand jury or trial by a petit jury that has been selected in a discriminatory manner has standing to challenge the jury selection system under which his grand or petit jury was selected because "unconstitutional jury selection procedures cast doubt on the integrity of *the whole judicial process* ". 407 U.S. at 502, 92 S.Ct. at 2168.

In *Peters,* the Court found that a white criminal defendant had standing to challenge the system used to select both the grand jury that indicted him and the petit jury that tried him which he claimed arbitrarily excluded blacks from jury service. Peters challenged the jury selection system used in Muscogee County, Georgia on both due process and

equal protection grounds. The jury lists in Muscogee County were made up from the tax digests which were by law segregated according to race. 407 U.S. at 496 n. 3, 92 S.Ct. at 2165 n. 3. Moreover, the jury lists contained a proportion of blacks that was much smaller than the proportion of blacks in the population or in the tax digests. *Id.*

In a plurality decision, the Supreme Court held that Peters, a white man, had standing to challenge the systematic exclusion of blacks from jury service on due process grounds, explaining:

> [A]State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. *Illegal and unconstitutional jury selection procedures cast doubt on the integrity of **the whole judicial process.***
>
> \*   \*   \*   \*   \*   \*
>
> In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few.
>
> *Accordingly, we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury on the ground that it arbitrarily excludes from service the members of any race. and thereby denies him due process of law.*

407 U.S. at 502–04, 92 S.Ct. at 2168–69 (opinion of Marshall, J.) (emphasis added).

---

**21.** To test whether this relationship is real, for standing purposes, imagine if there were a system which, at the outset, assigned judges to cases based upon the race of the judge. For purposes of determining if a defendant had a close enough relationship to the selection system by which he was assigned his judge, and to the entire Bench, one need only ask if there would be any question that that defendant would be deemed to have a close enough relationship with the entire court such that he could challenge the racially discriminatory assignment system—even if the judge to whom he was assigned was not of the same race as he and even if he had never been before or even met the non-assigned judges. Clearly, it would not seriously be contended that the Defendant did not have a sufficiently close relationship to the court as a whole to challenge the assignment system.

The paradigm here is precisely the same. The Defendant's relationship here is really that between the Defendant as an accused and the excluded person as his prospective judge. This Court believes that the fact that the exclusion takes place more surreptitiously at an earlier point in the process is largely irrelevant for standing purposes.

Justice White also emphasized, in his concurring opinion, the court's duty to see to it that the defendant's constitutional rights are protected *throughout the entire process* of bringing him to justice. *Id.* at 505–07, 92 S.Ct. at 2170. Justice White wrote:

[W]here jury commissioners disqualify citizens [from jury service] on the grounds of race, they fail "to perform their constitutional duty ... not to pursue a course of conduct in the administration of their office which would discriminate in the selection of jurors on racial grounds." *Hill v. Texas,* 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942). Thus, "no State is at liberty to impose upon one charged with crime in its trial procedure which the Constitution, and an Act of Congress [18 U.S.C. § 243][22] passed pursuant to the Constitution, alike forbid.... *It is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice, he shall enjoy the protection which the Constitution guarantees ...." Id.,* at 406 [62 S.Ct. at 1162].

It is true that the defendant in *Hill* was a Negro and petitioner here is a white man. It is also true that there is no case in this Court setting aside a conviction for arbitrary exclusions of a class of citizens from jury service where the defendant was not a member of the excluded class.... For me, however, *the rationale and operative language of Hill v. Texas suggest a broader sweep: and I would implement the strong statutory policy of § 243, which reflects the central concern of the Fourteenth Amendment with racial discrimination, by permitting petitioner to challenge his conviction on the grounds that Negroes were arbitrarily excluded from the grand jury that indicted him. This is the better view, and it is time that we now recognized it in this case and as the standard governing criminal proceedings instituted hereafter,* Hence, I join the judgment of the Court.

*Id.* at 506–07, 92 S.Ct. at 2169–70 (White, J. concurring) [emphasis added].

For all of the foregoing reasons, the Court finds that Defendant Greene has third-party standing to assert the equal protection rights of excluded potential white jurors to challenge discrimination at the Qualified Jury Wheel formation stage.

## B. TIMELINESS

### 1. Fed.R.Crim.Pro. 12(b)

The Government contends that the Court is precluded from considering Defendant's equal protection challenge because it was not raised before trial as required under Fed. R.Crim.Pro. 12(b), nor was it raised within seven days after trial as required under Rule 33.

Fed.R.Crim.Pro. 12(b) provides, in pertinent part:

Any defense, objection or request which is capable of determination without the trial of the general issue *may* be raised before trial by motion.... The following *must* be raised prior to trial:

(1) Defenses and objections based on defects in the institution of the prosecution; or

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings); or

(3) Motions to suppress evidence; or

(4) Requests for discovery under Rule 16; or

(5) Requests for a severance of charges or defendants under Rule 14.

Fed.R.Crim.Pro. 12(b) (emphasis added).

Therefore, the plain language of Rule 12(b) clearly does not require that constitutional challenges to the jury selection process *must* be made prior to trial. The Government, instead, relies upon *Shotwell Manufacturing v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), con-

---

**22.** 18 U.S.C. § 243 provides:

No citizen possessing all other qualifications which are or may be prescribed for jury service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous servitude....

**1138**

tending that it establishes that all motions challenging any phase of the jury selection process must be made prior to trial. However, *Shotwell* does not stand for the proposition that Rule 12(b) requires constitutional challenges to be made prior to trial. Rather, in *Shotwell,* the trial court had denied a new trial motion challenging the jury selection process as untimely, and the Supreme Court simply found no abuse of discretion on the part of the trial judge in denying that motion. Moreover, the defendant's motion in *Shotwell* challenged the selection process used in empaneling the defendant's trial jury. Thus, the Court reasoned that the defendant's motion fell within Rule 12(b)(1) as a "defect in the prosecution". The challenge in this case is much broader—it challenges this District's entire system for creating a jury wheel from which juries for *all* trials in this District will be drawn.

Perhaps the most important distinction between *Shotwell* and the instant case, however, is that in *Shotwell,* the Court was particularly persuaded that the defendant's jury selection challenge was untimely because the first mention of challenging the jury array was not made until the filing of supplemental pleadings **four years** *after the trial had concluded.* In this case, Defendant Greene *did* timely make an initial challenge to the jury selection process (albeit in the Sixth Amendment context) before the jury was sworn, and therefore "before trial".

The Court further notes that Defendant's equal protection argument was first advanced by her new counsel, who was appointed well *after* prior counsel had already filed the original new trial motion. Soon after the appointment of Defendant's new attorney, the Court conducted a status conference with counsel, and at this conference, defense counsel immediately advised the Court of his desire to supplement the new trial motion filed by prior counsel with an equal protection argument.

Rule 12(f) provides that a

[f]ailure by a party to raise defenses or objections or to make requests which must be made prior to trial ... shall constitute a

waiver thereof, *but the court for cause shown may grant relief from the waiver.* Fed.R.Crim.Pro. 12(f) (emphasis added).

■ Therefore, even if the Court were to find, as the Government urges, that, under *Shotwell,* Defendant was required to have asserted her equal protection argument prior to trial, in light of the above-discussed circumstances concerning the substitution of defense counsel and the timing of new counsel's assertion of an equal protection argument, the Court finds sufficient good cause for disregarding the pre-trial motion requirements of Fed.R.Crim.Pro. 12(b).

For these reasons, the Court rejects the Government's Rule 12(b) untimeliness argument.

### 2. *Fed.R.Crim.Pro. 33*

Fed.R.Crim.Pro. 33 presents an entirely different set of timeliness issues, however. Rule 33 requires new trial motions (other than motions based on newly-discovered evidence) to be made "within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period." Unlike Rule 12(f), which, as noted, expressly permits a court to disregard the "prior-to-trial" motion requirements of Rule 12(b) upon a showing of good cause, Rule 33 does not include such permissive waiver language. To the contrary, Fed.R.Crim.Pro. 45 appears on its face to clearly prohibit the district courts from enlarging the time limits set forth in Rule 33, by providing "[T]he court may not extend the time for taking any action under Rules 29, 33, 34 and 35, except to the extent and under the conditions stated in them." The Supreme Court's recent decision in *Carlisle v. United States,* — U.S. ——, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996), supports this construction of the interplay between Rule 45 and those Rules (29, 33, 34, and 35) to which its prohibitory language applies on its face. In *Carlisle,* the Court construed the 7–day time limit for filing a post-trial motion for acquittal under Rule 29 [which is in all relevant respects identical to the 7–day limit of Rule 33] and Rule 45's prohibition against extending time limits for filing post-trial motions, and concluded that the district court had no

authority to grant the defendant's post-trial motion for acquittal which was filed only one day outside the time limit prescribed in Rule 29. —— U.S. at ——, 116 S.Ct. at 1470. The Court explained:

> These Rules [i.e., Rules 29 and 45] are plain and unambiguous. If, as in this case a guilty verdict is returned, a motion for judgment of acquittal must be filed within seven days of the jury's discharge, or within an extended period fixed by the court during that 7–day period. *There is simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict motion* for judgment of acquittal, regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error.

—— U.S. at ——, 116 S.Ct. at 1464 (emphasis added).

It is undisputed that Defendant Greene's original new trial motion, in which she argued only that the underrepresentation of blacks in her venire violated her Sixth Amendment right to a trial by a jury drawn from a fair cross section of the community, was timely filed. However, it was not until eight months after the jury returned a guilty verdict against Ms. Greene that she moved for new trial on Fifth Amendment equal protection grounds based upon the alleged discrimination against non-black potential jurors under the Eastern District of Michigan's Jury Selection Plan.

The question, of course, then becomes whether the later-filed supplemental brief, can, for timeliness purposes, relate back to the earlier timely-filed motion. Several courts have considered the issue of whether an amendment or supplemental pleading alleging new grounds in support of a motion for new trial which is not filed until after the expiration of the time limits provided in Rule 33 can be saved by the fact that the original new trial motion was timely filed. In all of those cases, the courts have determined that the amendments/supplemental arguments are to be treated as separate new trial motions, separately subject to Rule 33's time limits. *See, United States v. Hall*, 854 F.2d 1269 (11th Cir.1988); *Anthony v. United*

*States,* 667 F.2d 870 (10th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Newman,* 456 F.2d 668 (3rd Cir.1972).

For example, in *United States v. Hall, supra,* the defendant timely filed a motion for acquittal or new trial, and at the same time (i.e., within the 7–day time limits of Rules 29 and 33) requested a one-week extension of time within which to file a memorandum in support of his motion. The district court entered an order granting the extension of time requested, and in accordance with the court's order, the defendant filed a memorandum in support of his motion in which he argued that (1) there was not substantial evidence supporting the jury's verdict; (2) the government did not prove the case as framed in the indictment and in its opening statement; and (3) various errors committed during trial were sufficiently egregious to warrant a mistrial. 854 F.2d at 1270.

Two weeks later, the defendant filed another new trial motion, this one based on "newly discovered evidence." The alleged "new" evidence was the anticipated exculpatory testimony of one of the defendant's employees. The district court determined that the defendant failed to exercise due diligence in locating the prospective witness prior to trial, one of the requirements for establishing that evidence is "newly discovered" and thus entitled to the 2–year time limit provided in Rule 33. However, "in the interest of justice", the trial court treated the defendant's second new trial motion as a supplemental motion which related back to his original motion. After a hearing on the matter, applying the broad discretion vested in courts deciding whether the "interests of justice" call for a new trial, the Court granted the defendant's new trial motion. *Id.* at 1271. The Government appealed the trial court's decision.

The Eleventh Circuit Court of Appeals reversed the district court explaining:

> We do this because the court simply had no power to find that the September 9 motion was a supplement to the August 21 motion. *The grounds set forth in the original motion were specific and did not*

*relate in any way to newly discovered evidence.* And, if it could not relate the motion back to August 21, then it could not apply the interest of justice standard.

*Rule 33 clearly states that a court may only grant an extension of the seven-day period during those first seven days. Fed. R.Crim.P. 33. Rule 45 of the Federal Rules of Criminal Procedure ... stresses that "the court may not extend the time for taking any action under [Rule 33] except to the extent and under the conditions stated in [the rule]."* Fed.R.Crim.P. 45. Following these clear instructions, our court has ruled that, after the expiration of the seven-day period prescribed in Rule 33, a district court no longer has jurisdiction to enter an order purporting to enlarge the time within which a defendant can file such a motion. (Citation omitted.) *Id.* at 1271–72 (emphasis added).

Similarly, in *United States v. Newman,* 456 F.2d 668 (3rd Cir.1972), the Third Circuit held that the grounds relied upon by a district court in support of its grant of a motion for new trial must have been part of the new trial motion filed within the seven-day period prescribed in Rule 33, unless there was an explicit order entered within that 7–day period extending the time. Thus, the appellate court determined that an amendment to a timely-filed new trial motion made four and one-half months after the seven day period had elapsed could not be considered by the trial court, *id.* and it reversed the district court's grant of defendant's new trial motion on grounds which were not raised until more than four months after the expiration of the Rule 33 time limit.

In *Anthony v. United States,* 667 F.2d 870 (10th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982), the Tenth Circuit affirmed the district court's denial of the defendant's motion for new trial on untimeliness grounds. In so doing, the Court of Appeals noted that, although Anthony's original motion for new trial was timely filed, it did not allege government misconduct as one of the grounds. The first allegation of government misconduct was made in a supplemental memorandum which was not filed until after the period for filing a motion for new trial had expired. *Id.* at 875. In affirming the district court's denial of the motion for new trial, the appellate court stated:

> In denying Anthony's motion, the trial court properly relied upon *United States v. Newman,* 456 F.2d 668 (3d Cir.1972). The court there held that **a defendant may not amend his motion for a new trial to include a new ground after expiration of the period prescribed by Fed. Rules Cr. Proc. Rule 33, 18 U.S.C.A.** Consequently we hold that the trial court did not err in denying Anthony's motion for new trial based upon governmental misconduct.

*Id.* at 876 (emphasis added).

Although the Sixth Circuit has not yet explicitly dealt with the supplemental/amended new trial motion issue, it did affirm, albeit without comment, the decision of a district court on this issue in *United States v. Turner,* 490 F.Supp. 583 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). In *Turner,* the defendant filed a timely motion for new trial alleging as grounds for that motion, governmental misconduct. Two months later, Turner filed a "Supplemental Motion for New Trial", stating facts supplanting the original new trial motion.

Acknowledging that the time limitations of Rule 33 are jurisdictional, the district court determined that the dispositive issue for consideration on the timeliness issue was whether the defendant had adequately stated all of the grounds upon which he based his new trial argument in the original motion. The court found that he did. The court distinguished Turner's supplemental motion from supplemental motions alleging new grounds, and found that Turner's supplemental motion only added additional *facts* in support of his motion. The court determined that such additional facts could properly be considered since no new grounds were raised in the supplemental pleading and the new facts were pertinent to the government misconduct grounds alleged in the original timely filed new-trial motion.

Turning to the instant action, Defendant Greene argues that the Court should find that her Supplemental Motion "relates back" to her original timely filed motion, which as discussed above, alleged only that there was an underrepresentation of blacks on the jury venire in her case, and this underrepresentation violated her Sixth Amendment right to a trial by a fair cross section of the community. Because she was challenging "jury selection" she contends that her original motion "put at issue" the mechanics of the 1992 Jury Selection Plan, albeit in the context of a Sixth Amendment challenge. She claims that her Supplemental Brief merely argues a different aspect of the same issue—the method by which this District attempts to achieve a racially-balanced jury pool.

■ Although the Equal Protection issues raised by Defendant in her Supplemental Motion are important to the jurisprudence of this District and require consideration, this case cannot be the vehicle for determination of that issue because the Court must disagree with Defendant's construction of the nature of the later-filed pleadings and find her Equal Protection argument untimely. The challenge Greene made in her Supplemental Motion is distinctly different from her initial one, both in the facts it relies upon and in its legal grounding. Rather than merely adding factual support for her allegations of violation of her Sixth Amendment rights, in her Supplemental Motion she argues the violation of Fifth Amendment equal protection rights of third parties (rather than herself) due .to the exclusion of whites from the qualified wheel, not the alleged systematic exclusion of blacks which formed the basis of her Sixth Amendment argument.

■ Defendant also argues that the Court should consider that her original trial counsel who filed her original motion withdrew and her equal protection argument was advanced for the first time as soon as new counsel was appointed. However, as the Court has noted, such "good cause" arguments have no place in the context of Rule 33's jurisdictional time limits. It is irrelevant for purposes of Rule 33's time requirements that the defendant's new new–trial argument was advanced for the first time by new counsel appointed to take over the defendant's case following the withdrawal of the defendant's original trial counsel. *See United States v. Wiman,* 77 F.3d 981 (7th Cir.1996).

■ At oral argument, defense counsel seemed to suggest that he was prepared to assert as an additional basis for new trial ineffective assistance of counsel with respect to the failure of her original trial counsel to raise the equal protection challenge. While ineffective assistance of counsel has been deemed by a minority of courts to amount to "newly discovered evidence" entitled to the benefit of the extended 2–year deadline in Rule 33, in the Sixth Circuit, evidence of ineffective assistance of counsel is not "newly discovered" for purposes of a motion for new trial where the facts supporting the claim were within the defendant's knowledge at the time of trial. *United States v. Garcia,* 19 F.3d 1123, 1126 (6th Cir.1994).

Here, the "facts" were clearly within the knowledge of Defendant at the time of trial. The Jury Selection Plan with its subtraction method of filling the Qualified Wheel has been in place since 1992. The specific Administrative Order implementing the Plan which is challenged by Defendant was in place for more than a month before trial, and all of the law upon which Defendant predicates her Equal Protection arguments was well-established long prior to the commencement of her trial.

■ Perhaps more to the point, this Court explicitly brought the equal protection issue to Defendant's attention on the record, on two separate occasions, in stating its reasons for rejecting trial counsel's oral arguments challenging the jury venire that the Eastern District's Jury Selection Plan. Indeed, the Court explicitly told defense counsel that, rather than raising Sixth Amendment fair representation issues, the Court's Jury Selection Plan could potentially be

viewed as violative of the equal protection rights of whites whose names were removed from the qualified wheel.[23] For these reasons, the Court must find that, even if couched as an ineffective assistance of counsel argument, Defendant's Supplemental New Trial Motion would not be entitled to the extended 2–year time limit provided in Fed.R.Crim.Pro. 33.[24]

23. In addressing defense counsel's fair representation objections to the venire panel at trial, the Court discussed the Eastern District's vigorous method under its Jury Selection Plan for insuring minority representation and brought to Defendant's attention the equal protection implications of the Plan. The Court stated:

> We have made more of an effort than any other Federal district court in this entire nation to insure minority representation. We have gone to far greater lengths to insure that, and indeed, as I told you yesterday, there have even been some judges on this court who have suggested that the method that we use to insure minority representation could be subject to constitutional challenge....
>
> ... To insure that minorities are fairly represented in the venire pools, or to attempt to insure that they are represented in venire pools, we racially balance the qualified jury wheel, and we do it ... on the basis of black and white. This is the practice that some judges on this court, and other lawyers, believe could be subject to constitutional challenge.
>
> This issue has never been joined but if it were joined, I think that there would be a serious question of equal protection and equal rights, because, of course, the right to jury service inheres under the *Batson* case and its progeny, not in the rights of the parties but in the rights of the individual people to fulfill their actual right to jury service. And I would be concerned that if this practice were challenged, of racially balancing ... on the basis of race, ... I would be concerned that non-minority members of this community could challenge the practice constitutionally.... I haven't done any research on this and I certainly am not expressing a formal legal opinion here, but I think there's a serious question here....

[5/15/96 Trial Transcript]

24. This is not to say that Defendant is foreclosed from raising ineffective assistance of counsel in a properly filed § 2255 Motion. However, without deciding the merits of such a § 2255 argument, from the facts presented, the Court believes that it is unlikely that the sole fact that original trial counsel did not raise the equal protection issue in Defendant's original new trial motion would amount to a legally sufficient "ineffective assistance of counsel" § 2255 claim.

25. Although the Court will not reach the merits of Defendant's equal protection arguments, as commentators have noted, the jury selection

For all of the foregoing reasons, the Court finds that Defendant's supplemental brief in which she raised for the first time as grounds for new trial an equal protection challenge to the Eastern District of Michigan's Jury Selection Plan to have been untimely under Fed.R.Crim.Pro. 33. Therefore, the Court determines that it lacks jurisdiction to consider the merits of Defendant's new trial equal protection arguments.[25]

"subtraction method" utilized by this Court to increase black representation on the jury is, essentially, a modified system of racial preference, which, regardless of the good-faith motivations behind the Plan, might be violative of equal protection guarantees. *See* King, *Racial Jurymandering, supra,* 68 N.Y.U. L.Rev. at 722. *See also, Developments in the Law—The Civil Jury,* 110 Harvard L.Rev. 1408, 1453 (1997); Note, *Jury Source Lists: Does Supplementation Really Work?* 82 Cornell L.Rev. 390, 430 (1997).

In this Court's own view, the District Court was well-motivated and well-intentioned in adopting both the "transfusion" and the "subtraction" methods, and the District's actions were taken at a time when the law concerning Jury Selection Plans and the Sixth Amendment fair representation rights of defendants and Fifth Amendment equal protection rights of prospective jurors was not yet settled. Since that time, the law has become clearer, particularly in the area of what is required and what is not required to meet the fair representation requirements of the Jury Selection Statute and the Sixth Amendment. If the District Court's Jury Selection Plan had a constitutional flaw, it is in its premise that in order to insure a fair representation of minorities on its juries, the Plan had to attempt to achieve statistical purity by having its Qualified Wheel perfectly mirror the census minority population in the Eastern District. As the Court noted *supra* in its Opinion, as the law has developed, this clearly is not required by either the statute or the Sixth Amendment and, although census population figures may provide a statistical ideal, the law does not require that a court's jury selection plan meet this ideal, particularly where, in order to meet that ideal, the equal protection rights of other racial groups may be implicated.

For the same reasons, the Government's argument in defense of the subtraction plan that, although subject to strict scrutiny, it is "narrowly tailored" to meet a compelling state interest is flawed in its premise. As the Government conceded at oral argument, the subtraction method can only be considered "narrowly tailored" if one accepts the premise that the state's compelling interest in providing fair representation of minorities requires a strict statistical mirroring of the minority population in the District. Clearly, the law does not require this, and, therefore, although the state's interest in fair representation may be compelling, any plan which discrimi-

## CONCLUSION

For all of the reasons stated in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant's Motion for New Trial be, and hereby is, DENIED.

nates against one group in order to achieve that statistical purity cannot be considered narrowly tailored.

Another problem posed by the District's use of the subtraction plan to achieve statistical purity for one racial group is that it opens the door for other "distinctive" or legally cognizable racial, ethnic or religious groups to require the same treatment. For example, Hispanics or Arab–Americans, both of whom have significant populations in the Eastern District, could well demand that the subtraction method be used to achieve "fair representation" of their populations. And, of course, once such racial, ethnic or religious "jurymandering" begins, there is no legally principled way to draw distinctions, and the District Court would quickly find itself inextricably entwined in a system which would re-

quire highly burdensome manpower and financial resources, all to implement a policy which neither the law nor the Constitution requires.

In this context, the Court notes that the District Court has recently modified its implementation of its Jury Selection Plan to "recycle" those white persons "subtracted" from the Master Wheel for future draws from the wheel, thus preserving the potential opportunity for jury service for those people. (Whether this modification cures any possible constitutional problems with the Plan is, of course, not for this Court to address here.) The Court also notes that the District Court has also initiated a process to review its Jury Selection Plan, and as part of this review, the equal protection concerns raised in Defendant's Motion are to be considered and addressed.