**UNITED STATES of America,**
**Plaintiff,**

v.

**Brian BROWN, et al., Defendants.**

**No. 99–CR–80035–5.**

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 16, 2000.

Michael Buckley, Asst. U.S. Atty., for plaintiff.

Gerald Sniderman, Huntington Woods, MI, S. Allen Early, III, Detroit, MI, Thomas Warshaw, Farmington Hills, MI, Fred Walker, Royal Oak, MI, Martin Crandall, Dearborn Heights, MI, for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS SUPERSEDING INDICTMENT

ROSEN, District Judge.

### I. INTRODUCTION

As set forth in a prior Opinion and Order in this case, see United States v. Brown, 90 F.Supp.2d 841 (E.D.Mich.2000), Defendant Brian Brown is named in Count One of the First Superseding Indictment in this case, and is charged along with several co-defendants with conspiracy to distribute cocaine and crack cocaine between 1987 and January of 1999. On September 29, 1999, Defendant Brown filed a Motion to Dismiss Superseding Indictment, arguing that the process used in this District to select grand and petit jurors violates his right to equal protection under the law as guaranteed by the Fifth Amendment, his Sixth Amendment right to an impartial jury that fairly represents the community, and his rights under the federal Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 et seq. Defendants Jimmie Eaton, Betty Parnell, Kevin Courtney, and Michael Moore have joined in Brown's motion.

In order to obtain evidentiary support for his motion, Defendant Brown sought discovery of various jury selection materials maintained by the Clerk of the Court. In the midst of this discovery effort, Chief Judge Zatkoff issued Administrative Order No. 00–AO–060 on October 20, 2000. This Administrative Order identifies the jury selection materials that will be made available in most cases, and requires that any requests for additional information or materials be pursued by motion to the Chief Judge.[1]

In accordance with AO–060, as well as this Court's September 29, 2000 Order implementing the Administrative Order in the context of this case, Defendant Brown's counsel, along with the Government's counsel, recently examined jury questionnaires for the time period identified as relevant by defense counsel, spanning from March to November of 1998.[2]

---

1. Previously, by stipulated Order dated February 3, 2000 and signed by both Defendant Brown's counsel and the Assistant U.S. Attorney, this Court had authorized somewhat broader discovery of jury-related materials, albeit not all of the materials sought by Defendant and his counsel. In light of the Administrative Order, however, this Court issued an Order on September 29, 2000 modifying its prior February 3 Order to comport with the forthcoming AO–060. Defendant continued to pursue the matter, but Chief Judge Zatkoff issued an Opinion and Order on December 21, 2000 denying his request to inspect additional materials.

2. The starting point of Defendant's inspection apparently was determined by reference to the Sixth Circuit's decision in United States v. Ovalle, 136 F.3d 1092 (6th Cir.1998). As discussed below, Ovalle invalidated a portion of the jury selection plan previously used in this District. According to Defendant, the March 8, 1998 petit jury pool and the April 1,

Following this inspection, Defendant filed a supplemental brief in support of his motion on October 31, 2000, and the Government filed a supplemental response in opposition to this motion on November 9, 2000.

On December 21, 2000, this Court held a hearing on Defendant's motion. Having reviewed the briefs and other materials filed by the parties, and having considered the arguments of counsel at the December 21 hearing, the Court now is prepared to rule on Defendant's motion. For the reasons set forth below, the Court finds that Defendant has failed to establish a constitutional or statutory infirmity in the juror selection process as applied to his indictment and forthcoming trial.

## II. ANALYSIS

### A. The Jury Selection Plans Used in This District

In surveying the methods used in this District to generate pools of eligible grand and petit jurors, the Court begins on well traveled ground. As this Court discussed at length in *United States v. Greene*, 971 F.Supp. 1117, 1120–24 (E.D.Mich.1997), the jury selection plan implemented in this District in 1992 included a "subtraction" scheme that was intended to increase the level of African American representation in the jury pools. In *United States v. Ovalle*, 136 F.3d 1092, 1105–07 (6th Cir. 1998), the Sixth Circuit held that this subtraction method was constitutionally infirm. Accordingly, the jury selection plan now in use in this District no longer includes this element.

Under the former "subtraction" method, the jury clerk would compile a "wheel" of qualified jurors, and then would determine whether a cognizable group was over-represented in the resulting wheel. If so, the clerk, under the direction of the Chief Judge, would randomly remove a specified number of persons belonging to the over-represented group until the wheel was deemed "balanced." For example, in applying this method in 1996, and comparing the racial composition of the 1995 qualified juror wheel with the overall population figures for this District as reported in the 1990 census, then-Chief Judge Cook determined in an April 15, 1996 Administrative Order that 645 "White and Other" qualified jurors should be randomly removed from the 3,749 total qualified jurors whose names appeared in the 1996 wheel. This particular subtraction was intended to address a disparity between the African American population in this District (19.1 percent) and the representation of African Americans in the qualified juror wheel (16.09 percent). Similar subtractions were performed in other years. *See Greene*, 971 F.Supp. at 1122–24.[3]

In *Ovalle*, however, the Sixth Circuit barred any further use of this overtly race-based method of equalizing juror representation. Where race was "the predominant factor in excluding certain individuals from the jury wheel," the Court explained that only a "compelling governmental interest" could justify such action, and that "the means chosen must be narrowly tailored to meet that interest." *Ovalle*, 136 F.3d at 1105. Although the Government had a sufficiently compelling interest in "creating a jury pool that represents a fair cross section of the community," the Sixth Circuit found that the means chosen to vindicate this interest was not narrowly tailored, because the plan as implemented did not "concern itself with any other cognizable group other than African–Americans."

1998 grand jury pool were the first such pools formed under the post-*Ovalle* selection plan. Thus, Defendant's inspection began with the questionnaires used to select these jury pools, and continued through the impanelment date of the grand jury that returned his indictment.

3. In *Greene*, this Court noted that the subtraction method of increasing African American representation in the jury selection process was, "essentially, a modified system of racial preference" which raised serious, and perhaps fatal, constitutional concerns. *Greene*, 971 F.Supp. at 1142 n. 25.

136 F.3d at 1106. Accordingly, the Court struck down the subtraction method as violative of the Fifth Amendment guarantee of equal protection under the law.

In the immediate wake of *Ovalle*, this District applied a jury selection method similar to the one adopted in 1992, but minus the offending subtraction method. Over the course of the past three years, however, both prior to and after the *Ovalle* decision, the Court has explored various methods for ensuring that the pools of eligible grand and petit jurors better represent a fair cross-section of the community. For example, the Court commissioned a study by G. Thomas Munsterman, Director of the National Center for State Courts' Center for Jury Studies, which was detailed in a report dated July 16, 1997, and identified a number of problems with the existing process of identifying and attracting eligible jurors.[4] As a result of this study and other efforts by Court personnel, various improvements have been made, including: (1) the use of a centralized and computerized Qualified Voter File ("QVF") recently propagated by the State of Michigan, which promises to speed up the process of collecting names and reduce the problems associated with outdated addresses and deceased voters; and (2) the expansion of the source list of possible jurors to include individuals who have been issued personal identification cards by the State of Michigan.[5]

As of October of 2000, the jury wheels in the Southern Division of this District now reflect these various improvements. However, during the 1998 time frame identified by defense counsel as relevant here, the District essentially applied the 1992 jury selection plan, minus the subtraction method. Accordingly, the Court now turns to an examination of the qualified juror pools that resulted from this 1998 post-*Ovalle* selection process.

## B. The Post-*Ovalle* Grand and Petit Jury Pools

As noted in *Greene*, the jury selection process begins with the formation of a "master" jury wheel, which is compiled through a random selection of names from voter lists, the Michigan drivers' license list, and, more recently, the Michigan personal identification card list. *See Greene*, 971 F.Supp. at 1120. According to Defendant, the master wheel of petit jurors for the period from March 8, 1998 through November of 1998 consisted of 5,409 individuals, of whom 590, or 10.9 percent, were African American. These individuals were sent questionnaires to determine whether they qualified for jury service. Of those who were sent questionnaires, 4,614 responded, were deemed qualified, and were placed on the "qualified" jury wheel. The qualified wheel included 532 African Americans, or 11.5 percent of the total pool of qualified jurors.[6]

---

4. The study and resulting report, both of which pre-dated *Ovalle*, identified the lack of centralized voter lists and the higher jury service burden on Detroit residents, in light of the separate Detroit Recorder's Court, as two major reasons for the under-representation of African Americans in this District's jury selection process. (*See* Government's 11/9/00 Response to Defendant's Suppl. Memorandum, Ex. 3, Christie Aff. at ¶ 4.) Both of these problems have since been addressed, through the State of Michigan's creation of a centralized and computerized voter list, and through the recent elimination of Detroit Recorder's Court. (*See id.* at ¶ 5.)

5. Previously, the source pool had been derived only from voter registration and drivers' license lists. *See Greene*, 971 F.Supp. at 1120–21. In addition, before the advent of the centralized QVF, voter lists were maintained separately by each municipality, so that the jury clerk had to survey "over 600 separate voter lists from the various cities, townships and villages that make up the voting precincts in this district." 971 F.Supp. at 1121.

6. As noted at the December 21 hearing, there is an ambiguity in the numbers set forth in Defendant's supplemental brief. However, in a December 29, 2000 letter to the Court, defense counsel confirmed that the above numbers and percentages are correct.

Turning to the grand jury pool, Defendant states that a total of 385 persons were sent questionnaires for grand juries impaneled between April 1, 1998 and October 1, 1998, and that 46 of these individuals were African American. Thus, African Americans who were sent questionnaires comprised 11.9 percent of the total. Defendant does not indicate how many of the 385 individuals returned their questionnaires or were deemed eligible for grand jury service, nor does the record disclose the racial composition of the qualified pool of eligible grand jurors.

The 1990 census continues to provide the most up-to-date population figures for the nine counties from which jurors are drawn for cases tried in this District's Detroit courthouse. According to Defendant, 19.1 percent of this population is African American. *See also Greene,* 971 F.Supp. at 1124 (quoting this figure from the 1996 Administrative Order implementing the subtraction method for that year). Thus, there is an 8.2 percent "absolute disparity" between this overall population figure (19.1 percent African American) and the group of individuals from the master wheel who were sent questionnaires for petit jury service during the relevant 1998 time period (10.9 percent African American). *See Greene,* 971 F.Supp. at 1127 & n. 11 (defining the term "absolute disparity" as used in the context of jury selection). Regarding the racial composition of those persons who were deemed qualified after these questionnaires were returned and reviewed (11.5 percent African American), the disparity is 7.6 percent. Finally, the group of individuals sent questionnaires for grand jury service during the relevant time frame was 11.9 percent African American, resulting in a disparity of 7.2 percent from the overall population.

### C. Defendant's Challenges Under the Sixth Amendment and the JSSA

As the principal argument in support of his motion, Defendant contends that this District's grand and petit jury pools for the relevant portion of 1998 did not represent a fair cross section of the community, and thus violated his right to an impartial jury under the Sixth Amendment, as well as his statutory rights under the JSSA. The Sixth Amendment guarantee of an "impartial jury" has been construed as "encompassing the right to a jury drawn from a 'fair cross section of the community,'" *Greene,* 971 F.Supp. at 1126 (quoting *Taylor v. Louisiana,* 419 U.S. 522, 526, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975)), and this same requirement is expressly stated in the JSSA, *see* 28 U.S.C. § 1861. *Ovalle* holds that these constitutional and statutory claims are governed by the same standard, which "requires a showing of underrepresentation of a distinct group." *Ovalle,* 136 F.3d at 1099.

Before reaching the merits, however, the Government contends that Defendant failed to timely assert his challenges to the composition of the jury pools. In particular, regarding Defendant's constitutional claim, the Government first points to Local Criminal Rule 12.1 of this District, which requires that pretrial motions be "filed within the time specified in the standing order," and then notes that the deadline set forth in the standing order is "within twenty (20) days of the date of arraignment." Yet, as Defendant points out, Local Rule 12.1 permits the motion cut-off date to be "modified by order of the District Judge," and the Court exercised this authority in this case, through Orders dated July 20, 1999 and October 15, 1999, to extend the motion cut-off date to November 30, 1999. Defendant filed the present motion on September 29, 1999, well before this deadline. Thus, he timely asserted his constitutional challenge.[7]

▮ Next, regarding Defendant's claim under the JSSA, the Government points to

---

**7.** Indeed, it is worth noting that Defendant raised a different set of constitutional challenges in another motion filed on September 29, 1999, *see Brown,* 90 F.Supp.2d at 842, but the Government did not contend that this latter motion was untimely filed.

the portion of this statute requiring that motions based on a "substantial failure to comply with [the JSSA] in selecting the grand or petit jury" must be filed "before voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefore, whichever is earlier." 28 U.S.C. § 1867(a). The Government argues that the ground for Defendant's motion—*i.e.*, that the post-*Ovalle* jury selection process in this District results in the under-representation of African Americans in jury pools—clearly was discoverable in the immediate wake of *Ovalle* itself. In response, Defendant contends that his motion was filed within seven days of his counsel's reading of Judge Clay's opinion in *United States v. Spearman*, 186 F.3d 743, 749–54 (6th Cir.), *cert. denied*, 528 U.S. 1033, 120 S.Ct. 560, 145 L.Ed.2d 435 (1999), which suggests, in dicta, that the jury selection process in this District following *Ovalle* will invariably lead to the under-representation of African Americans. Upon considering these arguments, the Court concludes that Defendant's challenge under the JSSA was timely brought, particularly where the Court's analysis of this statutory claim precisely tracks the analysis of Defendant's timely Sixth Amendment claim, and where Defendant's motion was brought well in advance of voir dire and trial.[8]

Accordingly, the Court turns to the merits. *Ovalle* explains that "fair cross section" claims under the Sixth Amendment and the JSSA may be established either through direct or indirect evidence. *Ovalle*, 136 F.3d at 1099. In this case, there is no direct evidence that the post-*Ovalle* jury selection process in this District includes any feature that would invariably lead to the exclusion or under-representation of African Americans. To the contrary, where the process formerly included express race-based elements, it now relies on facially neutral source lists and random selection.

Consequently, Defendant must look to indirect evidence to satisfy his burden. Initially, this burden consists of establishing a *prima facie* violation of the constitutional and statutory "fair cross section" requirements. *See Ovalle*, 136 F.3d at 1099; *Greene*, 971 F.Supp. at 1127. There are three elements to this *prima facie* showing: (1) that a "distinctive group" is being excluded from the jury pool; (2) that the representation of this group in venires from which juries are selected is "not fair and reasonable" in comparison to the group's representation in the community at large; and (3) that this disparity is attributable to systematic exclusion of the group in the jury selection process. *See Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *United States v. Buchanan*, 213 F.3d 302, 309–10 (6th Cir.2000); *Greene*, 971 F.Supp. at 1127. This *prima facie* case creates a presumption that the jury selection process impermissibly fails to draw from a fair cross section of the community, but the Government may rebut this presumption by showing that "attainment of a fair cross section [is] incompatible with a significant state interest." *Duren*, 439 U.S. at 368, 99 S.Ct. at 670; *see also Greene*, 971 F.Supp. at 1127.

---

**8.** Alternatively, even if Defendant's JSSA challenge to the selection of grand jurors in this District might be deemed untimely, his challenge to the process of selecting petit jurors would not be similarly time-barred. As explained earlier, the jury selection process employed in this District has undergone a number of changes since *Ovalle* was decided, and the most recent system was put into operation only in October of 2000. Thus, until very recently, Defendant could not have known of the precise method by which the petit jurors at his forthcoming trial would be selected. Moreover, because jury selection for this trial has not yet begun, it would not have been possible for Defendant to identify, let alone challenge, the composition of the specific pool from which petit jurors will be selected for Defendant's trial. In this regard, Defendant's challenge is not brought too late, but rather too early.

Although Defendant has established the first element of his *prima facie* case, by pointing to African Americans as the "distinctive group" that was under-represented in this District's 1998 jury pools, the Court finds that the second and third elements of the *Duren* test have not been satisfied. First, regarding the "fair and reasonable" element, Defendant points to an 8.2 percent disparity between the African American population in the local community as a whole (19.1 percent) and the representation of African Americans among those who were sent questionnaires to serve as petit jurors in the relevant portion of 1998 (10.9 percent). Similarly, Defendant contends that the disparity in the racial composition of the grand jury pool for the relevant time period in 1998 was 7.2 percent (19.1 percent of the community is African American, versus only 11.9 percent of those receiving grand jury questionnaires).

As this Court has previously explained, "the imbalance necessary to establish a Sixth Amendment violation is not determined by a bright line test." *Greene*, 971 F.Supp. at 1128. Accordingly, *Greene* extensively surveyed the relevant case law, and pointed to decisions holding that absolute disparities of between 2.0 percent and 21.7 percent did not suffice to establish a substantial under-representation giving rise to an inference of unconstitutional exclusion. *See Greene*, 971 F.Supp. at 1128 (citing *Ford v. Seabold*, 841 F.2d 677, 684 (6th Cir.1988) (disparities of 21.7% and 18.7% in consecutive years); *Ramseur v. Beyer*, 983 F.2d 1215, 1232 & n. 18 (3d Cir.1992) (characterizing absolute disparity of 14.1% as "of borderline significance," and citing further cases involving disparities between 2.0% and 11.5%); and *United States v.. McAnderson*, 914 F.2d 934, 941 (7th Cir.1990) (rejecting 8% absolute disparity as "*de minimis*")). In addition, and as noted in *Greene*, there is considerable authority for the proposition that an absolute disparity of less than 10 percent seriously undermines, or even defeats, a claim of under-representation. *See Greene*, 971 F.Supp. at 1128; *United*

*States v. Grisham*, 63 F.3d 1074, 1078–79 (11th Cir.1995); *McAnderson*, 914 F.2d at 941; *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir.1980). In light of these precedents, *Greene* found that an 11.8–percent disparity in that case did not permit an inference of a Sixth Amendment violation. *Greene*, 971 F.Supp. at 1127–28.

█ Likewise, the disparities identified by Defendant in this case do not give rise to an inference of unconstitutional exclusion of African Americans from this District's jury selection process. Rather, in light of *Greene*, the cases cited therein, and the subsequent authorities, it can safely be said that the 7–to–8 percent disparities shown by Defendant here have never been held sufficient, standing alone, to satisfy the second element of a *prima facie* case under *Duren*. Yet, this is all that Defendant offers to meet his burden.

In any event, even assuming that a weak inference of exclusion could be drawn from Defendant's limited statistical samples, this inference would be overcome by the absence of evidence that any under-representation of African Americans in this District's jury pools is the product of "systematic exclusion." In *Duren*, this third element was satisfied through statistical evidence that "a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year," *plus* evidence of particular features in the selection process that led to this "systematic discrepancy." *Duren*, 439 U.S. at 366–67, 99 S.Ct. at 669–70. In contrast, the Sixth Circuit held in *Ford, supra*, that neither of these two forms of evidence had been produced. The Court first observed that "the alleged claim of underrepresentation in this case is supported only by the results of two samples." *Ford*, 841 F.2d at 685; *see also Ramseur*, 983 F.2d at 1233 (finding that two telephone surveys covering a two-year period were of "brief duration and limited sample size," thereby "undermin[ing] an inference that substantial underrepresentation of blacks took place over a significant period of time").

The Sixth Circuit then noted the absence of evidence linking the alleged under-representation—in that case, of women—to some particular aspect of the selection process:

> Additionally, Ford points to nothing in the selection process which makes it obvious that the underrepresentation was due to the system itself. We do not believe that the selection of jurors from a neutral master list, without more, can be construed as "systematic exclusion" as defined in *Duren* merely because the percentage of women selected does not precisely mirror the percentage of women in the entire community. No evidence was presented by Ford indicating that the jury commissioners utilized a particular system or procedure in order to exclude women.

*Ford,* 841 F.2d at 685; *see also United States v. Footracer,* 189 F.3d 1058, 1062 (9th Cir.1999) ("[T]he overwhelming weight of authority ... establishes that a jury selection system does not systematically exclude a distinctive group where the system treats all groups equally but has a disparate impact on one or more.").

Likewise, in the present case, Defendant has not identified a long-term and substantial .discrepancy in the representation of African Americans in this District's jury pools. More importantly, even if he had, he has not pointed to any aspect of the "system itself" that might produce such a discrepancy. On its face, the challenged jury selection process rests upon random selections from neutral source lists of registered voters and licensed drivers.[9] While Defendant suggests that African Americans are under-represented in the voter rolls, and that they are disproportionately susceptible to losing their drivers' licenses because of practices such as racial profiling, he has offered no evidence to support these claims, and the Court declines to take "judicial notice" of any systematic under-representation of African

Americans on these source lists. *See Footracer,* 189 F.3d at 1062–63 (surveying cases in which reliance on voter registration lists was upheld, even under the assumption that such lists might lead to the under-representation of racial minorities); *United States v. Smallwood,* 188 F.3d 905, 914 (7th Cir.1999) ("We have often approved the random selection of venires from voter registration lists."); *United States v. Miller,* 116 F.3d 641, 659 (2d Cir.1997) ("[A]bsent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of equal protection" (internal quotations and citation omitted).)

In the end, Defendant rests his "systematic exclusion" argument largely, if not entirely, on Judge Clay's dicta in *Spearman, supra* . Of course, this dicta cannot be viewed as the controlling law of this Circuit. To the contrary, the two other members of the *Spearman* panel both emphasized, in separate opinions, that Judge Clay did not speak for the Court when he considered the possible implications of *Ovalle* to the resulting jury selection process in this District. *See Spearman,* 186 F.3d at 756 (Ryan, J., concurring); 186 F.3d at 756–59 (Batchelder, J., concurring). In any event, this Court does not view Judge Clay's opinion as a sufficient substitute for the necessary proof of systematic exclusion. In essence, Judge Clay reasons that this District's post-*Ovalle* jury selection process will invariably produce unconstitutional results, because it lacks any feature, as a substitute for the constitutionally impermissible "subtraction" method, that promises to overcome the historical under-representation of African Americans in this District's jury pools. *See Spearman,* 186 F.3d at 752–54.

This Court sees two problems, one factual and one legal, with treating Judge

---

9. As noted earlier, the present system also relies on an additional neutral source list of state ID card holders. However, at the time encompassed by Defendant's statistical sample, this list was not yet incorporated into this District's process of jury selection.

Clay's opinion as tantamount to a "finding" of systematic exclusion in this case. First, as a factual matter, the opinion assumes that, since the subtraction method was implemented in 1992, there have been no other modifications to the jury selection system that might tend to narrow the gap between African American representation in jury pools and African American representation in the community. As noted in *Greene,* however, this District has employed other strategies over the years to ensure that all members of the community are afforded the opportunity to serve as jurors, such as following up with second questionnaires where citizens fail to respond to the first ones. *Greene,* 971 F.Supp. at 1123. Further, as outlined above, a number of improvements have recently been made to ensure that voter and driver lists are complete and up-to-date, and to look to other lists, such as the state personal ID card list, in an effort to reach a wider pool of potential jurors in the community. Thus, the Court respectfully disagrees with Judge Clay's suggestion that the judges of this District have "failed in their responsibility," *Spearman,* 186 F.3d at 754, to explore and implement constitutionally permissible measures for ensuring that jury pools properly reflect a "fair cross section" of the community.

Finally, the Court respectfully suggests that Judge Clay's opinion rests upon a flawed legal premise—that, because the 1992 plan included a method designed to increase the representation of African Americans, the prior plan must have been "constitutionally infirm," at least in the view of the judges who decided to change it. *See Spearman,* 186 F.3d at 747, 754. This reasoning fails to recognize the significant legal distinction between a mere statistical disparity reflecting the under-representation of a particular group, on one hand, and a constitutional violation, on the other. As this Court stated in *Greene:*

> If the District Court's [1992] Jury Selection Plan had a constitutional flaw, it is in its premise that in order to insure a fair representation of minorities on its juries, the Plan had to attempt to achieve statistical purity by having its Qualified Wheel perfectly mirror the census minority population in the Eastern District. As the Court noted *supra* in its Opinion, as the law has developed, this clearly is not required by either the [JSSA] or the Sixth Amendment and, although census population figures may provide a statistical ideal, the law does not require that a court's jury selection plan meet this ideal . . . .
>
> For the same reasons, the Government's argument in defense of the subtraction plan that, although subject to strict scrutiny, it is "narrowly tailored" to meet a compelling state interest is flawed in its premise. As the Government conceded at oral argument, the subtraction method can only be considered "narrowly tailored" if one accepts the premise that the state's compelling interest in providing fair representation of minorities requires a strict statistical mirroring of the minority population in the District. Clearly, the law does not require this, and, therefore, although the state's interest in fair representation may be compelling, any plan which discriminates against one group in order to achieve that statistical purity cannot be considered narrowly tailored.

*Greene,* 971 F.Supp. at 1142 n. 25.

▇ Accordingly, under this Court's understanding of the governing Sixth Amendment law, the judges of this District could properly have sought to address a statistical disparity, through implementation of the subtraction method and other measures, without effectively "admitting" a constitutional violation. Stated differently, this Court does not believe that the Eastern District must await a finding of illegality before it may adopt better means for ensuring that it draws jurors from a fair cross section of the community.

In sum, the Court concludes that Defendant has failed to establish the second and third elements of his *prima facie* case under the *Duren* standard. Defendant's Sixth Amendment and JSSA claims rest solely upon a statistical disparity that fails,

as a matter of law, to satisfy the second prong of this inquiry. In addition, he has not shown that this disparity is the product of a "systematic exclusion" of African Americans from this District's jury selection process. Accordingly, Defendant's Sixth Amendment and statutory challenges to the selection of grand and petit jurors must fail.[10]

### D. Defendant's Fifth Amendment Challenge

Next, Defendant argues that this District's post-*Ovalle* jury selection plan violates his Fifth Amendment right to equal protection under the law. To establish a *prima facie* equal protection violation, Defendant must satisfy a three-part test that significantly overlaps the *Duren* Sixth Amendment test. *See Ovalle*, 136 F.3d at 1104 (citing *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)). Most notably for purposes of this case, Defendant must show that the selection process used in this District is "susceptible to abuse or is not racially neutral." *Ovalle*, 136 F.3d at 1104 (internal quotations and citation omitted).

For the reasons set forth above, Defendant has failed to make such a showing here. On its face, the post-*Ovalle* jury selection plan in this District is racially neutral, relying solely on random selections from source lists that have not been shown to be impermissibly racially skewed or exclusionary. Moreover, there is no evidence that the source lists used in the selection process are "susceptible to abuse," and the remainder of the process is performed almost entirely by computer, with the only discretion exercised by the Chief Judge in deciding whether a person is legally excused from jury duty under the terms of the jury plan.[11] Consequently, the Court finds nothing in the record

that might support the inference that a systemic flaw, as opposed to one or more race-neutral factors, might be responsible for the relatively minor jury pool disparities identified by Defendant during the relevant 1998 time period.

### III. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's September 29, 1999 Motion to Dismiss Superseding Indictment, to Challenge the Grand and Petit Jury Selection Process and to Inspect Records and Statistics is DENIED, except as to those portions of the motion addressing discovery issues which have been resolved through this Court's prior Orders.

---

**10.** This ruling, of course, is without prejudice to Defendant's opportunity to analyze the pool of jurors from which his petit jury is drawn, and to determine whether this pool, and the process that led to its selection, violates his statutory or Sixth Amendment rights.

**11.** According to an affidavit submitted by the administrative manager of court operations in this District, Judith Christie, the Chief Judge makes this determination without any knowledge of the person's race.